In re MINPECO, USA, INC., Debtor.

**Petitioning Creditors Of Minpeco USA., Inc., Plaintiffs,**

v.

**Swiss Bank Corporation, Defendant.**

**Bankruptcy No. 95–B–21373(ASH).
Adversary No. 96–5322A.**

United States Bankruptcy Court,
S.D. New York.

Dec. 19, 1997.

Lisa M. Sheppard, DelBello, Donellan, Weingarten & Tartaglia, LLP, White Plains, NY, Bruce C. Fuchs, Klett, Lieber, Rooney & Schorling, Pittsburgh, PA, for Plaintiffs.

Philip N. Schaeffer, White & Case, New York City, for Defendant.

### DECISION GRANTING MOTION FOR SUMMARY JUDGMENT

ADLAI S. HARDIN, Jr., Bankruptcy Judge.

Plaintiffs, three creditors ("Petitioning Creditors") of debtor Minpeco, USA, Inc. ("Minpeco"), filed an involuntary Chapter 7 petition against Minpeco on July 24, 1995. In October 1995 Minpeco consented to the entry of an order for relief under Chapter 11 of the Bankruptcy Code. On November 15, 1996 this Court granted Petitioning Creditors' motion for leave to commence this adversary proceeding on behalf of Minpeco. The complaint was dated and filed December 4, 1996. After completion of discovery, defendant Swiss Bank Corporation ("Swiss Bank") moved for summary judgment.

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b) (Complaint ¶ 3).

### Local Bankruptcy Rule 7056–1

Local Bankruptcy Rule 7056–1 provides as follows:

On any motion for summary judgment pursuant to Bankruptcy Rule 7056, there shall be annexed to the notice of motion a separate, short, and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit the statement shall constitute grounds for denial of the motion. Papers opposing a motion for summary judgment shall include a separate, short, and concise statement of the material facts as to which it is contended that there is a genuine issue to be tried. All material facts set forth in the statement required to be served by the moving party shall be deemed admitted unless controverted by the statement required to be served by the opposing party.

One of the most critical and, at times, difficult determinations to be made on a motion for summary judgment is whether there exist any *genuine* issues of *material* fact requiring a trial. Local Rule 7056–1 is designed to facilitate that determination. The Rule requires the moving party to present a "short, and concise" statement of the facts on which the movant relies in seeking judgment. What is contemplated obviously is not a compendium of evidence in narrative form, but rather a concise distillation of those crucial facts which are truly determinative of the outcome of the case. In response, the opposing party is required by the Rule to show which of plaintiff's claimed undisputed facts are the subject of genuine dispute. To accomplish this objective, the Rule obviously contemplates that the opposing party will respond with particularity to each of plaintiff's claimed undisputed facts, demonstrating as to each fact why there is a genuine dispute if such is the claim. Of course, the opposing party is certainly free to present its own statement of facts, but it must respond with particularity to the

movant's statement if it wants to controvert the movant's facts.

Swiss Bank's Statement Under Rule 7056–1 ("Defendant's Statement" or parenthetically "Def.Stat.") certainly is not "short," consisting of 113 numbered paragraphs on 24 pages. But Defendant's Statement does set forth in simple, declarative sentences the matrix of facts which Swiss Bank contends are incapable of genuine dispute and entitle Swiss Bank to judgment as a matter of law. Petitioning Creditors have made no attempt to comply with their obligation under Rule 7056–1 to submit a "short, and concise statement of the material facts as to which it is contended that there is a genuine dispute to be tried." No where do Petitioning Creditors address the factual recitations in Defendant's Statement or attempt to demonstrate on a paragraph-by-paragraph basis that there is any genuine dispute as to the facts which are set forth in Defendant's Statement. Instead, Petitioning Creditors have submitted a document entitled "Petitioning Creditors' Statement of Disputed Facts Pursuant to Bankruptcy Rule 7056–1" ("Plaintiffs' Statement" or parenthetically "Pltf.Stat.") comprising 125 paragraphs on 48 pages. Many of the factual assertions in Plaintiffs' Statement are either duplicative of Defendant's Statement or otherwise not in dispute. The numbered paragraphs in Plaintiffs' Statement, many of which are lengthy, argumentative and conclusory, do not make any reference to any of the numbered paragraphs in Defendant's Statement, nor do they correspond numerically or purport to reply to the numbered paragraphs in Defendant's Statement.

■ As a consequence, it is impossible to determine whether Petitioning Creditors contend that there is a genuine dispute requiring trial as to any of the facts set forth in Defendant's Statement. It is the obligation of Petitioning Creditors under Rule 7056–1 to set forth with particularity the facts relied upon by Swiss Bank which Petitioning Creditors contend are genuinely disputed. It is neither required nor appropriate for the Court to attempt to deduce from Petitioning Creditors' 48–page recitation which statements of fact, if any, in Swiss Bank's 24–page recitation are the subject of genuine dispute requiring a trial.

The consequence of Petitioning Creditors' failure to controvert with particularity any of the facts in Defendant's Statement is set forth in Rule 7056–1. The Rule states in the last sentence:

> All material facts set forth in the statement required to be served by the moving party *shall be deemed admitted unless controverted* by the statement required to be served by the opposing party. (emphasis supplied)

Accordingly, the facts in Defendant's Statement shall be "deemed admitted," and the Court will proceed on the assumption that there is no triable issue of fact with regard to the facts set forth in Defendant's Statement, since Petitioning Creditors have provided no evidentiary basis to conclude otherwise. The Court will address certain purported disputed factual issues raised in Petitioning Creditors' Memorandum at the end of this decision.

### The Facts [1]

Minpeco is a New York corporation with headquarters in White Plains, New York. Until June 1995 Minpeco was engaged in the business of buying metallurgical products from Latin American producers and marketing them to customers in Latin America, North America, Europe and Asia. Primarily a merchant of physical metal commodities, Minpeco also operated in the cash, forward, futures and options markets in order to hedge the price risk inherent in physical transactions (Pltf.Stat.¶ 1). Minpeco had been owned by the Peruvian Government until 1992, when it was "privatized" and Minpeco's ownership was transferred to the control

---

1. Unless otherwise indicated, "The Facts" are drawn from Defendant's Statement.

of a Brazilian entity named Companhia Mercantile Industrial Inga ("Inga"). Minpeco's stock was held by Ralbir S.A. ("Ralbir"), a Uruguayan holding company which is owned by Inga. Prior to 1995 Minpeco's sales approached $300–$400 million annually.

Defendant is a banking company organized under the laws of Switzerland with a branch in New York City.

Petitioning Creditors are Cyprus Copper Marketing Corporation ("Cypress"), which is located in Larchmont, New York and engaged in the business of marketing copper and molybdenum. Electrofinance, Ltd. ("Electrofinance"), an investment company located in Georgetown, Grand Cayman, Cayman Islands, B.V.I., and Industria Venezolana de Cables Electricos, C.A. ("Cable"), a Venezuelan manufacturer of copper and cable owned by Electrofinance.

Minpeco was a long-standing customer of Swiss Bank. Until the critical events in this dispute commencing June 20, 1995, Minpeco appeared to Swiss Bank to be in sound financial and operating condition. Prior to June 1995, to Swiss Bank's knowledge, Minpeco had never defaulted on any of its financial obligations and had shown good profitability and growth for a company of its size.

Much of the metals stock that Minpeco sold was bought on credit obtained by Minpeco from six banks. As of June 1995, Minpeco's lenders were Swiss Bank, Banque Paribas. Bank Francaise du Commerce Exterieur, Bank Brussels Lambert, ING Bank and Banco Credito del Peru. Minpeco's lenders generally provided Minpeco with individualized short-term trade finance loans in connection with the purchase of metals for specific sales to Minpeco's customers.

Most of Minpeco's trades were run on a "back-to-back" basis, in that Minpeco bought and sold metals contemporaneously and held little inventory. In many of its trades. Minpeco had to pay the seller before it received payment from the buyer, and payment from the buyer might take several days or weeks. Minpeco customarily obtained loans from its several lending banks, including Swiss Bank, to finance its commodity purchases, and the lenders would take an assignment of the account receivable owing to Minpeco from its buyer as collateral for repayment of the inventory purchase loan.

The credit relationship between Minpeco and Swiss Bank was governed by a Credit Agreement dated as of April 5, 1995 (the "Credit Agreement") and a General Security Agreement (With Floating Lien) dated April 5, 1995 (the "Security Agreement"), as well a security agreement (general collateral) dated April 15, 1992. During 1994 and 1995. Minpeco's credit facility with Swiss Bank generally ran as follows. An employee of Minpeco would contact Swiss Bank and present a potential trade transaction for financing. If the transaction did not fit Swiss Bank's loan profile or was otherwise not palatable, Swiss Bank would so advise Minpeco, and Minpeco would seek to finance the transaction with another of its banks. Swiss Bank declined to finance a number of transactions for Minpeco prior to June 1995. If Swiss Bank agreed to finance the transaction, pursuant to the Credit Agreement and the Security Agreement for each loan Minpeco would execute a promissory note and, as security for repayment of that note, would grant Swiss Bank an assignment of the proceeds of the account receivable, so that the proceeds of the account receivable were to have been used to repay the underlying note.

As of June 20, 1995, substantially all of Minpeco's outstanding loans from Swiss Bank involved financing against letters of credit. For collection risk purposes, Swiss Bank only financed transactions involving letters of credit drawn on banks approved by Swiss Bank. With an assignment of the letter of credit proceeds in place. Swiss Bank effectively shifted the financial risk in the transaction from Minpeco to the

bank issuing the letter of credit. Since the issuing banks and Swiss Bank had ongoing relationships, the repayment risk on Minpeco's notes was considered to be relatively low.

Receivables financing is obviously different from a working capital loan facility in which the borrower's financial strength is critical. If a trade finance facility is working properly, the borrower's balance sheet is nearly irrelevant as long as the borrower administers its trades efficiently and honestly. Swiss Bank held a security interest in all of Minpeco's assets as well as a guarantee by Inga of Minpeco's obligations to Swiss Bank. But until June 1995 Swiss Bank did not rely on either its general security interest in Minpeco's assets or in the Inga guarantee as the primary source of repayment of its transaction loans, Rather, Swiss Bank looked to the assignment of the accounts receivable and letters of credit for each of the transaction loans which it made to Minpeco.

■ In March 1995 an offshore subsidiary of Inga defaulted on a $10 million "pre-export"[2] loan from Banque Paribas in which Swiss Bank held a 25% participation. In April 1995 the amount outstanding to Swiss Bank under the Banque Paribas Loan was approximately $1.46 million. After Inga's default under the Banque Paribas Loan in March 1995, Swiss Bank continued to make letter of credit loans to Minpeco.

Between May 23 and June 21, 1995, Minpeco's indebtedness to Swiss Bank was reduced from approximately $14 million to $7,668,000 (Pltf.Stat.¶ 46), as Minpeco's inventory transactions financed by Swiss Bank closed and the loans came due and were repaid. As of June 23, 1995 Minpeco had eight promissory notes outstanding to Swiss Bank (the "Outstanding Notes").

The Outstanding Notes, which were due on various days in July 1995, aggregated approximately $5.9 million. The Outstanding Loans had been secured by assignments of accounts receivable and letters of credit. As amplified below, unbeknownst to Swiss Bank Minpeco had collected the accounts receivable and discharged the letters of credit for all eight Outstanding Loans and used the proceeds in its business, rather than to repay the Loans. The Outstanding Loans remain unpaid.

■ A turning point in the affairs of Minpeco occurred on June 20, 1995, when Inga filed for *concordata* in Brazil. A *concordata*, which bears some resemblance to a Chapter 11 reorganization in the United States, imposes a one- to two-year moratorium on all of the debtor's recognized debts.

On June 21, 1995, the day Swiss Bank learned of the Inga *concordata,* Minpeco presented to Swiss Bank five transactions for requested financing. One of the June 21 requests was a rollover of approximately $1.5 million in post-export loans which were due on that day. Two other June 21 requests for financing involved transactions (one for $520,000 and one for $507,-000) that were essentially post-export re-advances of pre-export loans that had been paid off by Minpeco earlier that week. With respect to each of these three requests for financing. Minpeco certified (falsely, as it was later revealed) to Swiss Bank that the letters of credit underlying the transactions were still open and pledged to Swiss Bank. Although concerned that these requests evidenced cash flow problems for Minpeco, Swiss Bank approved these three loan requests for approximately $2.5 million. The $2.5 million remains unpaid.

**2.** A "pre-export" loan is a loan against goods which have not yet been shipped. A "post-export" loan is a loan against goods which have been shipped and have a valid bill of lading. Generally, pre-export loans contain more risk to the lender than post-export loans, as payment of the ultimate receivable is dependent upon the borrower's ability to lade the goods and because, until a bill of lading is issued, the lender has no specific interest in the inventory.

The other two June 21 requests were for separate pre-export financings of $315,000 and $340,000 in connection with zinc purchases backed by letters of credit. Swiss Bank declined to finance these transactions because the letters of credit were drawn on Costa Rican and Asian banks unknown to Swiss Bank and neither transaction had an assignment of proceeds in place. Swiss Bank informed Minpeco by telephone on the afternoon of June 21 that it would not finance the two pre-export loan transactions and confirmed this by telex on June 22. No one at Minpeco made any protest in response to Swiss Bank's decision not to finance these two transactions.

On Friday, June 23, a Minpeco official called Swiss Bank to state that Minpeco was "out of cash" and that it needed a working capital loan of $3–4 million to meet its current trade obligations. Swiss Bank, which had not theretofore provided working capital financing, responded that it would provide such a loan, if at all, only after reviewing Minpeco's books of account. Minpeco did not make its books available to Swiss Bank, but suggested a meeting with Swiss Bank the next day, Saturday, June 24.

At 3:20 p.m. on June 23, Swiss Bank's officer Lukas Fischer, concerned by the possible impact on Minpeco of Inga's *concordata* and by the news of Minpeco's own cash crisis, and having no access to Minpeco's books, issued an internal memorandum concerning the cash account which Minpeco maintained with Swiss Bank. The memorandum stated: "PLEASE BLOCK ALL DEBITS TO THIS ACCOUNT. PLEASE CONTACT THE ACCOUNT OFFICER FOR DEBIT AUTHORIZATION." Swiss Bank informed Minpeco that it was prevented from withdrawing funds from the account without [Swiss Bank] authorization. (Pltf.Stat.¶ 71) However, Petitioning Creditors have not shown or even alleged that there was any money in the account as of 3:20 p.m. on June 23, or that Minpeco requested authorization to

withdraw any money from the account, and Swiss Bank has asserted in one of its memoranda that Minpeco had withdrawn all cash in the account before Swiss Bank issued the June 23 "blocking" memorandum. In any event, it is not controverted that until June 28, 1995. Swiss Bank did not turn down any request for transfers of funds out of the [Minpeco] account. (Def.Stat.¶ 54)

Representatives of Swiss Bank met with management representatives of Minpeco, Inga, and Minpeco, respectively, on Saturday, Sunday and Monday, June 24, 25 and 26, 1995. As of the June 24 meeting and into June 25, Swiss Bank was still under the impression that the letters of credit securing the eight Outstanding Notes aggregating $5.9 million were still open. In fact, however, all but $130,000 of Swiss Bank's collateral underlying the Outstanding Notes had been received and spent by Minpeco prior to June 23. On June 25 Swiss Bank learned that over the months prior to June 23 Minpeco had been using Swiss Bank's collateral to meet its own ongoing operating expenses, leaving repayment of Minpeco's notes to Swiss Bank to be made out of Minpeco's cash on an *ad hoc* basis. Minpeco did not inform Swiss Bank that it was repaying its loans out of Minpeco's own cash on an *ad hoc* basis, rather than out of the letters of credit and accounts receivable which were security for each note, for fear that Swiss Bank would cease financing. As a consequence, by June 23 there were no accounts receivable or letters of credit standing as security for the eight Outstanding Notes. The same problem applied to the $2.5 million in rollover loans extended by Swiss Bank to Minpeco on June 21. Minpeco had represented to Swiss Bank on that date that the letters of credit securing the rollover loans remained in place. In fact, however, those letters of credit had already been paid to Minpeco which had used the funds in the operation of its business.

Thus, as of June 23 there were virtually no accounts receivable or letters of credit

securing Minpeco's outstanding indebtedness to Swiss Bank, and there remained only two possible sources of repayment of that indebtedness, Minpeco's net worth and the Inga guarantee. Inga's filing for *concordata* on June 20 undermined both. Minpeco's 1994 audited financials reflected a shareholder equity of approximately $7 million. By June 1995 approximately $5.95 million of Minpeco's equity was in the form of obligations owing to Minpeco from Ralbir and Inga. At the June 24 meeting representatives of Minpeco informed Swiss Bank that, because of Inga's *concordata*, Minpeco's shareholder equity was only $1.5 million and falling rapidly. As of that date, substantially all of Minpeco's unpledged assets were extremely illiquid. At no time during or after the meetings that occurred during the weekend of June 24–26, 1995, did anyone associated with Minpeco provide assurances or express a hope that Minpeco could ever come up with cash to pay the Outstanding Notes at maturity.

During this critical period, in addition to its grave financial problems Minpeco also experienced a management crisis. On June 21, 1995 an Inga representative informed Swiss Bank that Inga was "disappointed" with Minpeco's current management and that it was going to "clean house" in White Plains. At the meeting on Sunday, June 25, between representatives of Inga and Swiss Bank, the Inga representatives informed Swiss Bank that Inga had fired Otto Gold. Minpeco's President and minority shareholder, on June 23.[3] At the June 25 meeting, Inga's representatives placed all of the blame for Minpeco's financial crisis on Minpeco's management and stated that all Minpeco's current management would be fired unless they could learn to toe the Inga line and work for the

company and not themselves. The cross-accusations of responsibility for Minpeco's financial problems by the Inga management and by the Minpeco management during the June 24 and 25 meetings and phone calls are detailed in Defendant's Statement ¶¶ 78–90.

At a meeting on Monday, June 26, 1995 between representatives of Swiss Bank and the remaining Minpeco management, the Minpeco management offered a plan for saving Minpeco. The plan called for Minpeco's banks to foreclose on Minpeco's shares, which had been pledged by Ralbir, take control of Minpeco forthwith and replace the Inga management and Board of Minpeco with a new Board of Directors and reinstate former management. The banks would provide $34 million in trade financing ($3 million above Minpeco's highest historical credit ceiling) and a $3 million unsecured line of credit for use at management's discretion. The Minpeco management was willing to put up $200,000 in equity, subsequently increased to $500,000 provided that Minpeco's banks would give them $300,000 in personal non-recourse loans at prime rate.[4] This plan was *not* acceptable to Swiss Bank. After the June 26 meeting, no new viable offers to restructure Minpeco were made by either Inga's or Minpeco's representatives.

At no time during this period was Swiss Bank permitted to audit Minpeco's books.

The situation as of June 28, 1995 was as follows. Minpeco had no cash to meet its current obligations. The Inga management had no experience in running a metals trading company such as Minpeco. Minpeco had ceased all trading, and Minpeco's brokers in London had closed out Minpeco's hedge positions, further diminishing Minpeco's net worth.

---

3. On June 23 Inga had repurchased Mr. Gold's Minpeco shares by wiring $54,000 from Minpeco's account at Swiss Bank to Mr. Gold. The same day, June 23, Inga also purchased the Minpeco shares of Carlos Meder, Minpeco's Vice President, for $54,000, also taken from Minpeco's funds at Swiss Bank.

4. Minpeco management had taken $400,000 in bonuses and $350,000 for Minpeco stock from Minpeco cash assets in April 1995.

On June 28, 1995 Swiss Bank prepared and delivered to Minpeco a notice of default under the Credit and Security Agreements. Thereafter, Swiss Bank set off against the proceeds of various receivables credited to Minpeco's account at Swiss Bank and, in addition, notified Minpeco's account debtors to remit payment directly to Swiss Bank.

### The Complaint

In their complaint in this adversary proceeding, the Petitioning Creditors assert the following causes of action.

### Count I—Breach of the Duty of Good Faith and Fair Dealing

This cause of action is predicated on the judicially-created implied covenant of good faith and fair dealing. The claim is based upon "Swiss Bank's actions in terminating Minpeco's lines of credit and closing its trading account without reasonable notice, in appropriating funds in the account, and in disrupting Minpeco's relationships with its customers" (Complaint ¶ 51).

### Count II—Breach of Contract

The conduct giving rise to this cause of action consisted of "Swiss Bank's above-described actions in terminating Minpeco's lines of credit and closing its trading account without just cause and related conduct" (*id.* at ¶ 59).

### Count III—Fraud

The Petitioning Creditors' fraud claim, based upon alleged material misrepresentations of fact, is articulated as follows:

"Immediately following the Inga Pre–Export Loan default, Swiss Bank made the following material misrepresentations to Minpeco: that the default would not adversely affect Minpeco or the credit relationship between Swiss Bank and Minpeco: that Swiss Bank viewed the Minpeco financing as 'stand-alone,' and that Swiss would continue its long-standing relationship with Minpeco." (*Id.* at ¶ 62).

### Count IV—Negligent Misrepresentation

Petitioning Creditors allege that based upon their course of dealing and long-standing relationship, Minpeco reposed trust and confidence in Swiss Bank, and Swiss Bank had a duty to disclose complete and truthful information to Minpeco and not mislead Minpeco. It is alleged that:

"Swiss Bank breached that duty by making numerous, material and false representations to Minpeco, and by failing to disclose critical facts to Minpeco, including without limitation, its intention to manipulate Minpeco and take drastic action against Minpeco in connection with the Inga Pre–Export Loan default." (*Id.* at ¶ 70).

### Count V—Equitable Subordination (11 U.S.C. § 510(c))

This claim is alleged against Swiss Bank based upon "its above-described actions" (*id.* at ¶ 74).

### Count VI—Interference with Contractual Relations

This cause of action is based upon Swiss Bank's "above-described actions, including without limitation, its direction to Minpeco's customers to remit to Swiss Bank funds owing to Minpeco" (*id.* at ¶ 79).

### Count VII—Turnover of Property

This cause of action seeks to recover from Swiss Bank "at least $1,329,731.60" which Swiss Bank appropriated from Minpeco's account with Swiss Bank during the period June 28 through July 6, 1995 (*id.* at ¶ 83) and other monies which many have been remined to Swiss Bank directly by Minpeco's customers (*id.* at ¶ 84).

### Count VIII—Constructive Trust

This count is based upon unjust enrichment as a result of [Swiss Bank's] above-described inequitable conduct (*id.* at ¶ 88).

### Count IX—Conversion

This cause of action seeks recovery of "the appropriated funds which were

wrongfully appropriated by Swiss Bank" (*id.* at ¶ 90).

### *Discussion*
#### *Summary Judgment*

Federal Rule of Civil Procedure 56(c), made applicable to the bankruptcy proceedings by Rule 7056 of the Federal Rules of Bankruptcy Procedure, provides that summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223 (2d Cir.1994). Summary judgment is favored to dispose of meritless claims. *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. On a summary judgment motion, the moving party has the burden of demonstrating the absence of any genuine issue of material fact, and all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *See United States v. Certain Funds on Deposit in Scudder Tax Free Inv. Account No. 2505103,* 998 F.2d 129, 131 (2d Cir.1993); *Thomson McKinnon Sec. Inc. v. Leasure (In re Thomson McKinnon Sec. Inc.),* 132 B.R. 9, 11 (Bankr.S.D.N.Y.1991); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Once the movant has made its showing, the burden of production shifts to the non-movant who must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file," establish that there is a specific and genuine issue of material fact warranting a trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. The non-movant cannot cast some metaphysical doubt on the moving party's assertions. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S.

574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991) (a summary judgment motion will not be defeated on the basis of conjecture or surmise). The non-movant must present specific significant probative evidence supporting its case sufficient "to require a . . . judge to resolve the parties differing versions of the truth at trial." *Moratzka v. Visa U.S.A. (In re Calstar, Inc.),* 159 B.R. 247, 251 (Bankr.D.Minn.) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). There is no genuine issue for trial if the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party. *See Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348. Further, the existence of disputed issues of fact will not result in denial of a motion for summary judgment unless the disputed issues are material to the determination of the legal claims and defenses. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505 ("Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment"); *Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.,* 67 F.3d 1063, 1066 (2d Cir.1995). The moving party may obtain summary judgment by showing that little or no evidence may be found in support of the non-moving party's case. *See Gallo,* 22 F.3d at 1223–24.

#### *The Counts of the Complaint*

##### *Counts I and II—Breach of Contract and the Implied Covenant*

The threshold task in any action for breach of contract is to identify the contract claimed to have been breached and examine its provisions, specifically, the provisions claimed to have been breached.

Petitioning Creditors have not alleged the existence of any oral contract between Minpeco and Swiss Bank. The record discloses only three written contracts between Minpeco and Swiss Bank, the Credit Agreement and the Security Agreement,

both executed in April 1995, and the security agreement (general collateral) dated April 15, 1992. Swiss Bank mentions the 1992 security agreement (general collateral) only for identification purposes in paragraph 13 of Defendant's Statement, and Petitioning Creditors make no reference to this agreement at all.

Having identified the universe of contracts between the parties, the question is what provisions of the Credit Agreement or the Security Agreement are alleged to have been breached by Swiss Bank? The answer is, "none." The Credit Agreement is mentioned only once in the Complaint, in paragraph 26 where it is simply alleged that the parties entered into the Agreement. The Credit Agreement is mentioned once in Petitioning Creditors' Surreply Memorandum, at page 22, but without any reference to breach of contract. The Credit Agreement is mentioned six times in Plaintiffs' Statement, at ¶¶ 35, 36, 38, 41, 42 and 97. The Security Agreement is mentioned in Plaintiffs' Statement once, at paragraph 97. None of these references asserts any claim that Swiss Bank breached either the Credit Agreement or the Security Agreement; indeed, none of the references contains any substantive discussion of either Agreement. Perhaps most significant in this regard is Petitioning Creditors' main memorandum in opposition to the motion for summary judgment ("Petitioning Creditors' Memorandum" or "Memorandum", abbreviated "P.C.Memo."). Point VII of Petitioning Creditors' Memorandum, pages 40–57, entitled "SWISS BANK BREACHED ITS CONTRACT AND THE DUTY OF GOOD FAITH AND FAIR DEALING," does not contain a single reference to either the Credit Agreement or the Security Agreement. There is no reference to the Security Agreement anywhere in the Memorandum. This Court could find only two references to the Credit Agreement in the Memorandum, at pages 26 and 35. There is no suggestion at either page that Swiss Bank breached the Credit Agreement.

To the contrary, at page 26 Petitioning Creditors appear to be attempting to disavow the Credit Agreement ("there is no evidence that those terms were even adhered to as part of the parties' long-established prior course of dealing.... Swiss Bank cannot rely upon any terms of the credit agreement which vary from the parties' course of dealing before and after the execution of the Credit Agreement"), and at page 35 Petitioning Creditors argue that "there is a clear factual issue as to whether" *Minpeco* violated the Credit Agreement.

■ The foregoing analysis is significant—indeed, it is determinative of Count II of the complaint. Petitioning Creditors have not alleged the existence of an oral contract, and they have not alleged any breach of any provision of any of the written contracts between Minpeco and Swiss Bank. Simply stated, **there is no claim of any breach of any contract.** In the absence of any claim, let alone evidence, of a breach of contract by Swiss Bank, the motion for summary judgment dismissing Count II of the complaint must be granted.

The specific conduct of Swiss Bank referred to in the complaint and in Petitioning Creditors' opposing papers cannot support a breach of contract claim because Petitioning Creditors have not alleged that any of that conduct breached any provision of the Credit Agreement or the Security Agreement. Nevertheless, in order to complete the analysis of Plaintiffs' breach of contract claims under Count II, the Court will examine briefly each act of Swiss Bank alleged under the breach of contract rubric.

Preliminarily, it is important to identify what appears to be Petitioning Creditors' central contractual theory. The constantly repeated theme which runs throughout Petitioning Creditors' papers in opposition to this motion is the "long-established prior course of dealing ... course of dealing before and after the execution of the Credit Agreement" (Memorandum p. 26),

Minpeco's "fifteen-year relationship with Swiss Bank," (*id.* p. 26), the "lengthy, continuous and uninterrupted course of dealing" between Minpeco and Swiss Bank (*id.* p. 44), coupled with countless references to Minpeco's "line of credit" with Swiss Bank (see, *e.g.*, Memorandum p. 25 "the Swiss Bank credit facility clearly operated as a line of credit," p. 28 "advances under the line of credit" and failing to provide Minpeco with advance notice before terminating "Minpeco's credit lines," p. 46 "terminating Minpeco's credit lines" and "termination of Minpeco's credit lines," p. 47 "available on its credit lines" and "terminated the credit lines" (twice), p. 53 "Swiss Bank terminated the credit lines"). But constant repetition of conclusory references to the parties' long-standing relationship and to Minpeco's alleged "credit lines" do not allege, let alone substantiate the existence of, *a contract* with identifiable contractual duties on the part of Swiss Bank.

There is no question that there was a long-standing relationship and that there was a credit relationship evidenced by specific loan transactions each with its own documentation, and the Credit Agreement and Security Agreement. But there was no other contract.

Specifically, there was no contract for a "line of credit." The penumbral references to "Minpeco's credit lines" obviously do not suffice as a basis for asserting that Swiss Bank had any sort of contract obligation to lend money to Minpeco, and indeed Petitioning Creditors do not make any such assertion. The nature of Minpeco's borrowing facilities with its six lenders during 1994 and 1995 is described in Defendant's Statement at paragraphs 8, 9, 10, 11, 13, 16, 17, 18, 19, 20 and 21. These paragraphs, which are not controverted by Petitioning Creditors, demonstrate that the long-standing practice of the parties was for Swiss Bank to make separately-documented loans to finance specific purchases of inventory against contracts for resale secured by assignments of the re-

sulting accounts receivable and, in 1995 at least, by letters of credit. This practice is precisely what is documented in the Credit Agreement and the Security Agreement. The Credit Agreement provides in paragraph 1 that Swiss Bank "*may* from time to time *in its sole discretion* make advances ... to [Minpeco] financing [Minpeco's] shipment pursuant to various contracts of sale ... of raw materials to various buyers ..." (emphasis supplied). There is not the slightest evidence in the record before this Court that Swiss Bank had any agreement with or obligation to Minpeco with respect to a general line of credit for working capital purposes or any other purpose, as Petitioning Creditors' oft-repeated mantra of "Minpeco's line of credit" would appear to suggest. There is no evidence the Swiss Bank ever made working capital loans to Minpeco. The long-standing credit relationship between Swiss Bank and Minpeco, described in the uncontroverted paragraphs of Defendant's Statement referred to above and reflected in the express provisions of the Credit Agreement quoted above, was exemplified in the eight Outstanding Loans remaining unpaid at the beginning of the week of June 19, 1995. Petitioning Creditors, perhaps unwittingly, concede all of the foregoing sentence in paragraph 42 of Plaintiffs' Statement, which states: "After the execution of the Credit Agreement, Minpeco continued to do business with Swiss Bank just as it had done under the parties' prior course of dealing."

With this background, the Court will examine each element of Swiss Bank's conduct complained of by Petitioning Creditors.

*The claim that Swiss Bank "terminated Minpeco's credit line."* As just noted, there is no factual basis to suggest that Swiss Bank had any contractual obligation to extend Minpeco a "line of credit"; under the Credit Agreement, Swiss Bank had the right to determine in its "sole discretion" whether to finance Minpeco's purchase of inventory, transaction by transac-

tion. Whether Swiss Bank "terminated" the Credit Agreement on June 21 or June 28 is immaterial to the motion for summary judgment, because Swiss Bank had no obligation to make any loans under the Credit Agreement and, in any event, it had the right to declare Minpeco in default on June 21.

*The Claim that Swiss Bank "blocked" or "froze" Minpeco's bank account.* Lukas Fischer's June 23 memorandum did not preclude withdrawal of funds, but merely required Swiss Bank's approval. Petitioning Creditors have not demonstrated that this constituted a breach of any contract. But if it did, there has been no showing that the breach had any practical adverse consequence for Minpeco. In fact, $108,000 was withdrawn from Minpeco's Swiss Bank account for the plainly improper purpose of discharging Inga's obligation to pay for the purchase of Minpeco's stock owned by Messrs. Gold and Meder ($54,000 was paid to each on June 23). Swiss Bank's assertion that "until June 28, 1995 Swiss Bank did not turn down any request for transfers of funds out of [Minpeco's] account" (Def.Stat.¶ 54) is uncontroverted. At the time they filed their opposition to the motion for summary judgment. Petitioning Creditors had had access to all information pertinent to Minpeco's finances including its account at Swiss Bank, but Petitioning Creditors have provided the Court with no information or evidence as to the amount of funds in the account and have made no assertion or even suggestion that Minpeco made any request to transfer funds out of the account between June 23 and June 28. Swiss Bank by counsel asserts that there were no funds in the account after the $108,000 was withdrawn on June 23. In short. Petitioning Creditors' constantly-repeated conclusory complaints regarding Swiss Bank's "freezing" of the account and the dire consequences of the "freeze" are without factual or evidentiary substance in the record before the Court.

*Swiss Bank's "related conduct."* Count II of the complaint at ¶ 59 identifies the conduct giving rise to the cause of action as "Swiss Bank's above-described actions in terminating Minpeco's line of credit and closing its trading account without just cause *and related conduct.*" The "above-described ... related conduct," presumably refers to the allegation in Count I ¶ 51 concerning Swiss Bank's actions "in appropriating funds in the account, and in obstructing Minpeco's relationships with its customers." Petitioning Creditors' Memorandum (*see* particularly point VII at pages 40–56) and Surreply Memorandum will be searched in vain for any explication of how or why Swiss Bank's actions in setting off funds in Minpeco's account and contacting Minpeco's customers with respect to accounts receivable subject to Swiss Bank's security interest constituted a breach of contract. No grounds appear to this Court for a finding or conclusion that these actions constituted breach of any contractual duty owed by Swiss Bank to Minpeco.

### Count I—the implied covenant of good faith and fair dealing

Petitioning Creditors acknowledge that their "claims are principally based upon Swiss Bank's knowing breach of its duty of good faith and fair dealing, as demonstrated by its announced decision to discontinue new lending and to freeze Minpeco's account without prior notice based solely on the Inga Concordata" (P.C.Memo. 10).

There is no question that the concept of an implied covenant of good faith and fair dealing is deeply embedded in New York case law and the New York Uniform Commercial Code. The authorities are cited and discussed in the parties' memoranda of law and need not be repeated here. Suffice it here to make a few basic observations. The implied covenant does not spring from a mere course of dealing: it is implied from an actual contract between the parties. *Filner v. Shapiro,* 633 F.2d 139, 143 (2d Cir.1980) (under New York law every contractual

obligation contains an implied covenant of good faith and fair dealing); *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publishing Co.*, 30 N.Y.2d 34, 45, 281 N.E.2d 142, 144, 330 N.Y.S.2d 329, 333 (under New York law, the implied covenant of good faith and fair dealing inheres in every contract), *cert. denied*, 409 U.S. 875, 93 S.Ct. 125, 34 L.Ed.2d 128 (1972); *Gordon v. Nationwide Mut. Ins. Co.*, 30 N.Y.2d 427, 437, 285 N.E.2d 849, 854, 334 N.Y.S.2d 601, 608 (1972) (quoting *Kirke La Shelle Co. v. Armstrong Co.*, 263 N.Y. 79, 87, 188 N.E. 163. 167 (1933)), *cert. denied*, 410 U.S. 931, 93 S.Ct. 1374, 35 L.Ed.2d 593 (1973). A corollary of this basic postulate is that the contract as written governs the relationship of the parties and, stated differently, courts are not at liberty to impose obligations under the guise of the implied covenant which are inconsistent with the terms of the contract from which the covenant is to be implied. *See Fasolino Foods Co. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir.1992); *Nat'l Westminster Bank, U.S.A. v. Ross*, 130 B.R. 656, 679 (S.D.N.Y.1991) ("covenant of good faith . . . cannot frustrate the operation of an express term of an agreement bargained for at arms length"), *aff'd*, 962 F.2d 1 (2d Cir.1992); *In re Bennett*, 154 B.R. 140, 154 (Bankr.N.D.N.Y.1992); *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 537 N.Y.S.2d 787, 534 N.E.2d 824 (1988); *Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983). A party which acts in accordance with rights expressly provided in a contract cannot be held liable for breaching an implied covenant of good faith. "[T]he implied covenant of good faith and fair dealing does not provide a court *carte blanche* to rewrite the parties' agreement. Thus, a court cannot imply a covenant inconsistent with the terms expressly set forth in the contract. . . . In addition, '[t]he mere exercise of one's contractual rights, without more, cannot constitute . . . a breach [of the implied covenant of good faith and fair deal-

ing]'." *Hartford Fire Insurance v. Federated Dep't Stores*, 723 F.Supp. 976, 991 (S.D.N.Y.1989) (quoting *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929 (5th Cir.1981) (applying New York law), *cert. denied*, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981)).

As in the case of Count II respecting breach of contract, Petitioners' particularized claims of breach of the implied covenant do not withstand analysis.

The thrust of Petitioning Creditors' claim under Count I is that Swiss Bank's refusal on June 21 to finance the two inventory purchase transactions of $315,000 and $340,000 was a breach of good faith because it was made **"without prior notice."** In the context of the Credit Agreement and the practicalities of the parties' business relationship, Petitioning Creditors' claim is little short of ridiculous. How would Swiss Bank give prior notice that it would decline to finance these two transactions before the transactions were presented to it? Assuming, as argued by Petitioning Creditors, that Swiss Bank had made a decision not to finance any more Minpeco transactions because Inga had filed for *concordata* on June 20 (an assumption which conflicts with the fact that Swiss Bank agreed to finance three of the five transactions presented by Minpeco on June 21), how could Minpeco have given notice of that decision prior to June 21? Moreover, Petitioning Creditors' claim under Count 1 conflicts with the express provisions of the Credit Agreement and the Security Agreement. The Credit Agreement provides in paragraph 1 that Swiss Bank may decide "in its sole discretion" whether to advance loans to finance particular inventory purchase transactions presented by Minpeco. Under paragraph 10 of the Credit Agreement and paragraph 9 of the Security Agreement, prior notice, presentment, demand and protest "are hereby expressly waived" by Minpeco. Under the well-established case law in New York, this Court cannot make a finding or conclusion, with or without a trial,

that Swiss Bank breached a purported covenant which contradicts the express terms of the only contract from which the covenant can be implied.

Petitioning Creditors rely heavily on the Sixth Circuit decision in *K.M.C. Co., Inc. v. Irving Trust Company*, 757 F.2d 752, 758–760 (6th Cir.1985) which held, on the facts in that case, that "at such time as Irving might wish to curtail financing KMC, as was its right under the agreement, this obligation to act in good faith would require a period of notice to KMC to allow it a reasonable opportunity to seek alternate financing, absent valid business reasons precluding Irving from doing so" (757 F.2d at 759), citing *Wells v. Alexandre*, 130 N.Y. 642, 29 N.E. 142, 143 (1891) ("[I]f a notice was requisite to its proper execution, a covenant to give such notice will be inferred, for any other construction would make the contract unreasonable, and place one of the parties entirely at the mercy of the other"). Even if *K.M.C.* were factually relevant here, this Court would be guided by the District Court in *National Westminster Bank v. Ross, supra*, 130 B.R. at 680, which stated: "[T]his court declines to follow *K.M.C.* to the extent that the obligation of good faith performance enunciated there would imply an obligation of good faith upon the Bank inconsistent with the express terms of its contractual relationship." As noted above, an implied obligation to give advance notice conflicts with the express provisions of paragraphs 10 and 9 of the Credit Agreement and Security Agreement, respectively, and, in any event, is meaningless in the context of the type of transaction-by-transaction financing involved here, where Swiss Bank obviously could not give advance notice of its decision whether to finance a particular transaction "in its sole discretion" until the transaction was presented to it.

But the *K.M.C.* case is inapposite because the rule there enunciated pertained to completely different facts. In *K.M.C.* the Bank and the Borrower were operating under a traditional "line of credit" agreement under which the Bank obligated itself to provide working capital financing on the Borrower's request up to a $3.5 million limit. The Credit Agreement provided that all receipts by the Borrower were required to be placed in a blocked account which was exclusively within the Bank's control. The Borrower had no other source of financing. Thus, "the literal interpretation of the financing agreement urged upon us by Irving ... would leave KMC's continued existence entirely at the whim or mercy of Irving, absent an obligation of good faith performance." 757 F.2d at 759. The facts here are quire different. Under the Credit Agreement, and the parties' long-standing practice, Swiss Bank made loans "at its sole discretion" for specific purchases of inventory on a transaction-by-transaction basis: Swiss Bank did not provide and had no obligation to provide working capital financing on an open line of credit. In addition to Swiss Bank, Minpeco had credit relationships with five other banks. Minpeco had "demonstrated an ability to obtain replacement financing.... Minpeco had recently obtained additional credit lines from ING Curacao ... and Banque Lambert Brussels" (Pltf.Stat.¶ 79). There is no claim that Minpeco could not or did not have other accounts with other banks. The Minpeco account at Swiss Bank was not "blocked" until June 23, and the block had no adverse impact on Minpeco because funds could be withdrawn with Mr. Fischer's authorization and Minpeco was not denied the right to withdraw funds until June 28. In short, the factual circumstances on which the *K.M.C.* holding was predicated are not present in this case.

■ The case law makes clear that the duty to give advance notice of termination of financing arises only where the lender has made a contractual commitment to provide financing at a specific time in a specific amount, or ongoing financing such as an line of credit for working capital purposes, and only in circumstances where the borrower justifiably relies on the lend-

er and has no practical alternative, as in the *K.M.C.* case. But the courts have rejected any duty to give advance notice in cases where the lender had made no contractual commitment to provide specific or ongoing financing. *See Manufacturers Hanover Trust Co. v. Yanakas,* 7 F.3d 310, 318 (2d Cir.1993); *Fasolino Foods Co., supra,* 961 F.2d at 1057 ("[bank] never represented that credit of a certain amount would be provided, and [debtor] had no reasonable expectation of continued, much less expanded, credit"). Swiss Bank had neither provided nor contracted to provide working capital financing to Minpeco.

■ Little further need be said with respect to Petitioning Creditors' claims of "breach of good faith" with respect to Swiss Bank's other actions during the period June 21–June 28, 1995. As to the purported "freeze" on Minpeco's bank account, whether Mr. Fischer's decision was a "good faith" reaction to the spiraling adverse events in Minpeco's financial condition, or a "bad faith" attempt to "punish" Minpeco for Inga's March Banque Paribas Loan default and Inga's June 20 *concordata,* as Petitioning Creditors argue (implausibly[5]), is irrelevant. Petitioning Creditors have not alleged that Minpeco had any money in the account or that Swiss Bank refused any request by Minpeco to make payment from its account prior to June 28. As to Swiss Bank's actions in setting off Minpeco's account and in notifying Minpeco's accounts receivable of Swiss Bank's rights as secured creditor under the Security Agreement, Petitioning Creditors do not argue that Swiss Bank did not have the right to take these actions under the Security Agreement. That being the case, any argument that these actions violated a purported implied covenant at vari-

ance with the parties' written agreement must be rejected as a matter of law.

■ Petitioning Creditors' final argument under Count 1 is that Swiss Bank did not act in good faith in formally declaring a default on June 28 based only upon the Inga filing for *concordata* and that Swiss Bank is "now estopped from making its *ex post facto* explanations" of other events of default (P.C.Memo. 53 *et seq.*). Once again, however, the contention that Swiss Bank should be held liable for declaring a default on June 28 is untenable as a matter of law and ridiculous in the context of the facts. As to the law, Petitioning Creditors cannot and do not dispute that the Inga *concordata* constituted an event of default under the express provisions of the Security Agreement. The Court is barred as a matter of law under the authorities cited and discussed above from holding Swiss Bank liable under a theory of breach of an implied covenant for doing what the Security Agreement expressly authorized it to do. The uncontroverted facts utterly refute any suggestion that Swiss Bank did not have a good faith basis to declare Minpeco in default by June 28, if not much sooner. By June 28 Swiss Bank had learned (i) that Minpeco's certification that the three loan transactions approved by Swiss Bank on June 21 were backed by letters of credit was false, (ii) that the accounts receivable and letters of credit assigned to Swiss Bank to secure the eight Outstanding Loans had been diverted by Minpeco and used to pay its ongoing costs of operation, leaving Swiss Bank with no source of repayment other than Minpeco's net worth and Inga's guarantee, (iii) that Inga's guarantee was worth little or nothing by reason of Inga's *concordata,* (iv) that approximately $5.95 million of Minpeco's equity was represented by obligations of dubious or all value owing to Minpeco

5. Swiss Bank's exposure under the Banque Paribas Loan was $1.46 million: its exposure under the eight Minpeco Outstanding Loans was $5.9 million. It is counterintuitive to suppose that even the most obtuse banker would act vindictively or otherwise in "bad faith" in such a manner as to knowingly and intentionally undermine the financial well-being of its much larger credit risk in order to force payment of a much smaller collateral obligation.

from its parent corporations, Ralbir and Inga, (v) that Minpeco's equity was only $1.5 million and falling rapidly, and (vi) on June 23, that Minpeco was "out of cash" and needed a working capital loan of $3–4 million to meet its current trade obligations. During the same period Swiss Bank learned that Minpeco's management was in a state of crisis and conflict between the Inga Board of Directors and the Minpeco management team. Minpeco had declined to permit Swiss Bank to examine its books. The Inga *concordata* constituted an event of default under the Security Agreement and there can be no dispute that there were multiple additional events of default under paragraph 10 of the Credit Agreement and paragraph 9 of the Security Agreement (*see* Swiss Bank's Memorandum footnote 13 at page 31). All of these facts, drawn from Defendant's Statement, are uncontroverted. There is no question that these events were "material" to Minpeco—by Petitioning Creditors' own account, Minpeco was "out of cash" by June 23 and substantially out of business by June 28.

### Counts III and IV—Fraud and Negligent Misrepresentation

As noted above, Petitioning Creditors' fraud and misrepresentation claims arise out of Inga's March 1995 default under the Banque Paribas loan, in which Swiss Bank had an unpaid participation to the extent of $1.46 million. The fraud claim is based upon the following purported "misrepresentations," as alleged in paragraph 62 of the complaint:

- "that [Inga's Banque Paribas Loan] default would not adversely affect Minpeco or the credit relationship between Swiss Bank and Minpeco".
- "that Swiss Bank viewed the Minpeco financing as 'stand-alone credit'", and
- "that Swiss Bank would continue its long-standing relationship with Minpeco."

On their face, these statements appear to be expressions of intent as to future conduct, rather than representations of existing fact, and as such they could not give rise to a fraud claim under elementary principles of law. As expressions of intent, or future undertakings, these statements could not possibly be construed as a binding contractual obligation to continue to provide financing irrespective of future events, and Petitioning Creditors do not so contend. In point of fact, Swiss Bank honored each of these assurances. Inga's default under the Banque Paribas Loan did *not* affect the credit relationship between Swiss Bank and Minpeco, Swiss Bank *did* treat the Minpeco relationship as a "stand-alone credit" and Swiss Bank *did* continue its long-standing relationship with Minpeco. Indeed, Swiss Bank granted three of Minpeco's five transaction financing requests on June 21, the day after there was a material adverse change in the parties' credit relationship as a consequence of Inga's filing for *concordata*.

Petitioning creditors attempt to overcome the fatal legal defect in their fraud claim by asserting that "Swiss Bank knew such representations were false when made, as Swiss Bank was simultaneously scheming to pressure Minpeco in an attempt to compel payment from Inga" (P.C.Memo. 58). Of course, the fact (if it was a fact) that Swiss Bank was "scheming" to "pressure" Minpeco with respect to Inga's default under the Banque Paribas Loan does not render false Swiss Bank's stated intention to continue its long-standing relationship with Minpeco, as demonstrated by the fact that Swiss Bank did continue its long-standing relationship with Minpeco until the unforeseen events commencing on June 20 materially changed the parties' circumstances. Moreover, there was nothing nefarious, secret or otherwise wrongful in Swiss Bank putting "pressure" on Minpeco with respect to Inga's Banque Paribas Loan default and, in any event, the "pressure" apparently had no consequence. Since it is not claimed that Minpeco spent a dollar of its

funds or took any other action to alleviate the Banque Paribas Loan default of its parent.

Petitioning Creditors' reliance contentions are a pastiche of conclusory assertions without any substance in fact. Thus, it is asserted (P.C.Memo. 58):

> Minpeco clearly relied upon Swiss Bank's assurances, and until Swiss Bank terminated Minpeco's credit lines, Minpeco had no reason to seek replacement financing on an expedited basis.... Swiss Bank's misrepresentations critically wounded Minpeco, because once Swiss Bank terminated Minpeco's credit lines and froze Minpeco's account, Minpeco is left without operating capital and could not operate its business.

As already made abundantly clear, this Court views these contentions as deplorable distortions of the record in this case. The *uncontroverted* facts are (i) that Swiss Bank did not terminate Minpeco's credit lines because Minpeco did not have any credit lines with Swiss Bank, (ii) that Swiss Bank did not "freeze" Minpeco's account and it did not deny a single request to disburse funds from the account before June 28, and (iii) that Minpeco not only did not refrain from seeking financing from other banks but "had demonstrated an ability to obtain replacement financing ... [and] had recently obtained additional credit lines from [two banks]" (Pltf.Stat.¶ 79). The fact that Minpeco was without operating capital and could not operate its business (P.C.Memo. 58) was in no way attributable to any conduct of Swiss Bank, which had not provided and had no obligation to provide Minpeco with working capital loans. In short, the fraud/misrepresentation claims are rhetoric, with no foundation in fact.

Counts III and IV are defective as a matter of law and unsupported by even the minimal factual showing required by Supreme Court and Second Circuit decisions. Summary judgment must be granted dismissing Counts III and IV.

## Counts V, VI, VII, VIII and IX

Little need be said beyond the foregoing analyses with respect to the remaining Counts in the Complaint, which do not purport to allege new facts or independent causes of action but seek remedies for previously-alleged purported wrongdoing. Thus, Count V. which seeks equitable subordination under 11 U.S.C. § 510(c), is based upon Swiss Bank's "above-described actions" (Complaint at ¶ 74). *See In re W.T. Grant Co.*, 4 B.R. 53, 74–75 (Bankr. S.D.N.Y.1980) ("With respect to a non-insider creditor's conduct, the standard of misconduct that would have to be demonstrated to justify equitable subordination is very substantial.... In order to equitably subordinate the claims of non-insiders, ... [i]t must be established that the holder of the claim to be subordinated committed fraud, overreaching or spoliation to the detriment of others. A mere statement that the creditor is guilty of 'inequitable conduct' will not suffice"). Count VI, Interference with Contractual Relations, is based upon Swiss Bank's "above-described actions, including without limitation, its direction to Minpeco's customers to remit to Swiss Bank funds owing to Minpeco" (*id.* at ¶ 79). Petitioning Creditors have made no attempt to demonstrate, either generally or with particularity, that Swiss Bank did not have the contractual right to direct Minpeco's customers to remit accounts receivable to Swiss Bank. Under New York law, a creditor with a security interest in all the debtor's assets including accounts receivable has the right to collect accounts receivable over which it has a lien. *See, e.g., Ultramar Energy, Ltd. v. Chase Manhattan Bank, N.A.*, 179 A.D.2d 592, 593, 579 N.Y.S.2d 353, 354 (1st Dep't 1992). Counts VII and IX for turnover of property and conversion relate to Swiss Bank's setoff of Minpeco's account, as well as its collection of accounts receivables. Petitioning Creditors have made no showing, factual or legal, that Swiss Bank's setoff was unlawful, other than the naked, conclusory reference to "Swiss Bank's wrongful exercise of dominion and control over

Minpeco's account and accounts receivable" (P.C.Memo. 70). The Security Agreement (¶ 5) expressly provided for Swiss Bank's right of setoff, confirmed by both common law and statute. *See, Fenton v. Ives,* 222 A.D.2d 776, 634 N.Y.S.2d 833 (3d Dep't 1995); *Chemical Bank v. Ettinger,* 196 A.D.2d 711, 602 N.Y.S.2d 332 (1st Dep't 1993); 9 N.Y.Jur.2d, *Banks and Financial Institutions,* § 304 at 542 (bank may setoff mutual debts with depositor provided there is no express agreement to the contrary); N.Y. Banking L. § 9–g(2). The constructive trust claim in Count VII is not a claim but a remedy and cannot afford an independent basis for holding Swiss Bank liable. *See, e.g., Scholes v. African Enterprise, Inc.,* 838 F.Supp. 349, 357 (N.D.Ill.1993) ("imposition of a constructive trust is a remedy and not a cause of action"); *Pucci v. Litwin,* 828 F.Supp. 1285, 1300 (N.D.Ill.1993) (same); *One–O– One Enterprises, Inc. v. Caruso,* 668 F.Supp. 693, 696 n. 1 (D.D.C.1987) (same), *aff'd,* 848 F.2d 1283 (D.C.Cir.1988).

Accordingly, summary judgment dismissing Counts V, VI, VII, VIII and IX must be granted.

### Disputed Issues of Fact

Petitioning Creditors argue that all factual inferences must be drawn in favor of the party opposing a motion for summary judgment and that, viewing the evidence in the light most favorable to Petitioning Creditors, there are genuine issues of material fact requiring a trial (P.C.Memo. 17 *et seq.*). They argue, *inter alia,* that "Swiss Bank's state of knowledge regarding Minpeco's financial condition should be assessed as of June 21–22, 1995, when it took the critical action of discontinuing new lending, freezing Minpeco's operational account and notifying Minpeco's management thereof" (*id.* at 20) and that "there are factual issues regarding the individual requests for financing denied on June 21" (*id.* at 27). But none of Petitioning Creditors' suggested inferences, no matter how implausible, gives

rise to an issue of material fact requiring a trial in this case. Even if one were to assume, *arguendo,* that on June 21 the responsible Swiss Bank officials told Minpeco that Swiss Bank would no longer finance any further inventory transactions *and* that they did so out of meanness, vindictiveness or other "bad faith" motivations, and not for "good faith" commercial reasons, such subjective determinations by a trier of fact could not change the uncontrovertible, objective facts or impose legal obligations on Swiss Bank where none exist. However stupid, vindictive or malevolent the Swiss Bank officials may have been, on a subjective level, the objective facts are: (i) Inga filed for *concordata* on June 20; (ii) the Inga *concordata* constituted an event of default under the Credit Agreement and the Security Agreement; (iii) under paragraph 1 of the Credit Agreement Swiss Bank had the right "in its sole discretion" to refuse to finance any further inventory transactions for Minpeco. Given these objective and uncontroverted facts, no court can impose liability on Swiss Bank based upon findings by a judge or a jury as to the subjective, internal motivations, thought processes or emotional state of Swiss Bank officials. Stated another way, conduct on the part of a bank or other commercial entity which is objectively lawful and within the bank's contractual rights cannot give rise to obligations or liability on the part of the bank merely by reason of stupidity, vindictiveness or bad attitude on the part of the bank's officer(s). The uncontroverted, objective fact is that by the week of June 20 Minpeco was "out of cash" and needed a $3–4 million working capital loan to meet its current obligations. Nothing that Swiss Bank did or failed to do contributed in any way to Minpeco's financial crisis, and Swiss Bank had no contractual or implied contractual obligation to provide such a loan.

Based upon the objective, incontrovertible facts, as a matter of law Swiss Bank cannot be held liable for refusing to loan

**32**

funds to Minpeco or for setting-off funds, because it had no obligation to loan funds and it had contract and common law rights to setoff. The alleged reaction of other banks, or brokers in London, or customers of Minpeco, to Swiss Bank's refusal to lend more money to Minpeco or its setoff of Minpeco funds is irrelevant. Swiss Bank's conduct was lawful, and third parties' reactions cannot make it unlawful.

To summarize, the few issues of fact which Petitioning Creditors have suggested in their Memorandum, even if deemed "genuine" issues within the meaning of the case law, are not "material" to the determination of the motion for summary judgment. Assuming resolution of those issues and drawing all reasonable inferences in favor of Petitioning Creditors, Swiss Bank nevertheless is entitled to summary judgment dismissing the complaint.

### Conclusion

Swiss Bank's motion for summary judgment is granted in its entirety and the complaint is dismissed with prejudice. Counsel for the parties are directed to agree upon the form of an order, to be prepared by counsel for Swiss Bank, without prejudice to Petitioning Creditors' right to appeal.