In re Dennis Monroe **BARNETTE**, Debtor.

**Eugene Mitchell, Plaintiff,**

v.

**Dennis Monroe Barnette, Defendant.**

**Bankruptcy No. 01–25048–BM.**
**Adversary No. 01–2386–BM.**

United States Bankruptcy Court,
W.D. Pennsylvania.

Aug. 16, 2002.

---

Donald R. Calaiaro, Esq., Pittsburgh, PA, for Plaintiff.

Gary H. Simone, Esq., Butler, PA, for Defendant.

### *MEMORANDUM OPINION*

BERNARD MARKOVITZ, Bankruptcy Judge.

Plaintiff Eugene Mitchell seeks a determination that a debt owed to him by debtor Dennis Barnette is excepted from discharge by § 523(a)(2)(A) of the Bankruptcy Code. He asserts that debtor made false representations to induce him to enter into an agreement with debtor to promote plaintiff's invention and to pay debtor a fee for so doing.

Debtor maintains that the debt is dischargeable. While conceding that he failed to perform as promised, debtor insists that he merely breached his contract with plaintiff and did not defraud him.

We conclude that the debt is excepted from discharge by § 523(a)(2)(A) for reasons set forth in this memorandum opinion and accordingly will enter judgment in favor of plaintiff and against debtor.

### – FACTS –

Plaintiff is a bus driver in Akron, Ohio. He was granted a patent in January of 1998 for a cup holder for use by bus drivers while driving a bus. Debtor has been a salesman of one thing or another for nearly all of his adult life. From 1968 through 1989 he worked in the home improvement field selling, *inter alia,* kitchens and bathrooms. From 1990 until 1995 he was a salesman for various enterprises that promoted new products to potential licensees and manufacturers. The latter entities by whom debtor was employed as salesman had successfully marketed only one product during this entire period—i.e., a device licensed to WalMart for removing and storing Christmas tree lights. No credible evidence was offered to indicate that debtor was involved with this one successful enterprise aside from the fact that it was pursued by his employer and some of his co-workers.

In 1995 Debtor went into business for himself promoting new products to potential licensees and manufacturers. He did business as D. Barnette Associates (hereinafter "DBA").

Debtor had four part-time employees in 1999–2000. One, who worked approximately 5 hours per week and earned $12 per hour, did artwork and prepared "slicks" of new products for presentation to potential licensees and manufacturers. Another, who also worked approximately 5 hours per week, prepared press releases about the new products for distribution to media outlets. A third located potential clients with new products in need of marketing and assisted debtor in selling DBA's services to them. A fourth employee, working approximately 15–20 hours per week and earning $12 per hour, supposedly identified potential licensees and manufacturers and sent them "slicks" of the client's product. Two different individuals, both of whom were college students, were employed in this capacity during this period.

DBA had no production or research facility of its own and had no tie-in with any manufacturer. It did not operate out of a commercial office of its own but operated instead out of debtor's personal residence

and shared a suite with other commercial enterprises at a place known as Stonewood Commons located in Wexford, Pennsylvania. All telephone calls to DBA were answered at Stonewood Commons and then forwarded to debtor's residence. DBA's name was posted on a sign located outside of the building along with the names of several other businesses that also used the facility.

Debtor located prospective clients by doing research at the local public library in sections identifying newly-developed products and inventions in need of marketing. He would make initial contact with a prospective client by telephone and would follow up with a post card. Debtor used the conference room at Stonewood Commons to impress and meet with prospective clients seeking to market their products.

Of the forty-seven products debtor agreed to promote from 1998 through 2000 while doing business as DBA, he did not successfully market a single one during this period.

Plaintiff received an unsolicited telephone call from debtor in September of 1999 congratulating him on his patent and informing plaintiff about the services DBA offered in promoting new products. He received a postcard from debtor shortly thereafter along with a questionnaire about debtor's invention. Plaintiff filled out the questionnaire and returned it to debtor.

Plaintiff and his wife drove to Wexford from Akron in October of 1999 at debtor's invitation. They met with debtor and DBA's sales representative in the conference room at Stonewood Commons and discussed the possibility of debtor promoting and marketing plaintiff's invention.

Debtor told plaintiff at the meeting that recently he had successfully marketed a product known as a supersoaker and that he was "close to wrapping up" two other deals for his clients. He opined that "the time for [debtor's] invention had arrived" and that he only "needed to put a shirt and tie on it" to successfully market the invention. In addition, debtor told plaintiff that he had a laboratory and research team in place, had a relationship with a manufacturer, and was ready and able to bring plaintiff's invention to market. Debtor did not disclose that he had not successfully marketed any products for his clients.

The following month plaintiff received from debtor a letter and a promotion agreement. In the letter debtor offered to act as plaintiff's agent in providing marketing services for plaintiff's invention in accordance with the terms and provisions of the enclosed agreement. In particular, debtor stated that he would prepare an advertising "slick" of debtor's invention; that he would identify appropriate manufacturers and would submit the "slick" to them with a view towards marketing the invention; and that he would negotiate on plaintiff's behalf with anyone who expressed interest in the invention.

Plaintiff executed the agreement and returned it to debtor on December 29, 1999. He also paid a promotion fee in the amount of $7,975 which debtor deposited into his own account. A percentage of the fee went as a commission to the salesman who had assisted debtor in procuring plaintiff as a client.

The promotion agreement provided, among other things, that DBA would promote plaintiff's invention for sale or licensing to manufacturers or others that may be interested in the invention. DBA promised that it would promote the invention using various methods. It would, for instance, prepare an advertising "slick" for submission to manufacturers and others. DBA further promised that it would identify and contact potential licensees and man-

ufacturers and would submit the advertising "slick" to them. Finally, DBA agreed to follow up with interested parties and attempt to negotiate a license agreement or outright sale to them.

Debtor did nothing at all in connection with promoting plaintiff's invention for approximately the first four months after plaintiff executed the promotion agreement.

On May 2, 2000, debtor issued a press release about plaintiff's invention to local media outlets in the Akron, Ohio, area. It was not distributed regionally or nationally. The local media ignored the press release.

In spite of weekly inquiries from plaintiff concerning debtor's efforts to promote his invention, plaintiff did not hear from debtor until May 16, 2000, nearly five months after plaintiff had entered into the promotion agreement. One of debtor's employees wrote to plaintiff to advise that she would contact him at least once a month to update him on the status of his product and to answer any questions he might have. The letter curiously made no mention of the press release which DBA had issued two weeks earlier.

Plaintiff heard again from DBA on August 10, 1999, when he received a letter from the same individual as had written to him previously. Plaintiff was informed about the above press release and was told that the "slick" for his invention was finished except for some changes in the language describing the invention plaintiff had suggested. Plaintiff was further informed that the next step once the "slick" was in final form was to "burn" a CD-ROM for distribution to potential licensees and manufacturers. No CD-ROM was ever "burned" and distributed to potential licensees and manufacturers.

Debtor ceased doing business as D. Barnette Associates in September or October of 2000. Except for the above press release and the preparation of a preliminary version of the advertising "slick", debtor did nothing to promote and market plaintiff's invention. In particular, debtor had not identified potential licensees and manufacturers, had not prepared a final "slick" of debtor's invention, and had not distributed a CD-ROM about the invention to potential licensees and manufacturers.

Debtor filed a voluntary chapter 7 petition on May 11, 2001. Amended schedules, filed on June 14, 2001, identified plaintiff as having a general unsecured claim in an unliquidated amount.

Plaintiff commenced this adversary action on September 16, 2001. He seeks a determination that the debt owed to him by debtor is excepted from discharge by, among other provisions of the Bankruptcy Code, § 523(a)(2)(A). Plaintiff avers that debtor fraudulently induced him to enter into the promotion agreement and to pay a promotion fee while knowing that he intended not to provide the agreed-upon services.

The adversary action was tried on July 1, 2002, at which time both sides were given an opportunity to offer evidence.

## – DISCUSSION –

■ The Bankruptcy Code is to designed to relieve debtors from the weight of oppressive indebtedness and to provide them with a "fresh start". *Insurance Company of North America v. Cohn (In re Cohn)*, 54 F.3d 1108, 1113 (3d Cir.1995). This "fresh start" is available, however, only to the "honest but unfortunate debtor". *U.S. v. Fegeley (In re Fegeley)*, 118 F.3d 979, 982 (3d Cir.1997).

■ Not all debts owed by an individual debtor necessarily are discharged in bankruptcy. Certain debts are excepted from discharge. Section 523 of the Bankruptcy Code provides in part as follows:

(a) A discharge under section 727... of this title does not discharge an individual debtor from any debt—....

(2) for money..., to the extent obtained, by—

(A) false pretenses, a false representation, or actual fraud....

11 U.S.C. § 523(a)(2)(A). Exceptions to discharge are construed strictly against creditors and liberally in favor of debtors. *In re Cohn*, 54 F.3d at 1113.

■ To prevail in this case pursuant to § 523(a)(2)(A), plaintiff must demonstrate that: (1) debtor obtained money from plaintiff by making a false representation; (2) debtor knew that the representation was false when he made it; (3) debtor made the representation with intent to deceive plaintiff; (4) plaintiff relied on the false representation; and (5) plaintiff suffered a loss as a proximate result. *American Express Travel Related Services v. Hashemi (In re Hashemi)*, 104 F.3d 1122, 1125 (9th Cir.), *cert. denied*, 520 U.S. 1230, 117 S.Ct. 1824, 137 L.Ed.2d 1031 (1997).

■ Even though § 523(a)(2)(A) does not expressly so provide, the false representation must be material. An untruth is "material" for purposes of § 523(a)(2)(A) if it is important enough to influence a creditor's decision to extend credit. *In re Cohn*, 54 F.3d at 1114.

■ In addition, the maker of the false representation must intend to deceive the person to whom it is directed. Were it otherwise, "common sense would balk". *Field v. Mans*, 516 U.S. 59, 68, 116 S.Ct. 437, 442–43, 133 L.Ed.2d 351 (1995). Intent to deceive may be inferred from the totality of the circumstances of a case. *In re Rembert*, 141 F.3d 277, 282 (6th Cir.), *cert. denied*, 525 U.S. 978, 119 S.Ct. 438, 142 L.Ed.2d 357 (1998). It may be found when the facts and circumstances present a picture of deceptive conduct on the debtor's part. *In re Hashemi*, 104 F.3d at 1125.

■ Reliance need not be reasonable for purposes of § 523(a)(2)(A); it need only be justifiable. *Field*, 516 US. at 68, 116 S.Ct. at 442–43. The falsity of a representation does not have to be so "well crafted" as to be virtually undetectable before a creditor's reliance is justifiable. Reliance may be justifiable even though its falsity would have been detected had there been an investigation. *Id.*

■ Justifiability does not, as is the case for reasonableness, depend on a community standard that applies in every instance. It instead depends on the qualities and characteristics of the particular individual who relies on the representation. *Field*, 516 U.S. at 71, 116 S.Ct. at 444. This does not mean that justifiability has no bounds or limits in this context. One must "use his senses" and cannot prevail if he "blindly relies" on a representation whose falsity would be "patent" to him had he made a "cursory" investigation. *Id.* One's reliance is not justifiable for purposes of § 523(a)(2)(A), in other words, if the falsity of the representation would be obvious after a cursory investigation.

■ The burden of proving that a debt is excepted from discharge by reason of § 523(a)(2)(A) lies with the party seeking to have it excepted from discharge. They must do so by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286–87, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991).

■ Plaintiff maintains that the debt owed to him by plaintiff is excepted from discharge by § 523(a)(2)(A). Debtor, plaintiff maintains, fraudulently represented that he would identify potential licensees and manufacturers and would submit a "slick" of his invention to them with a view towards promoting and marketing his invention.

The first, fourth and fifth of the above required elements of § 523(a)(2)(A) are not at issue in this case. It is uncontroverted that debtor obtained money from plaintiff by falsely representing that he would identify potential licensees and manufacturers and would submit a "slick" of debtor's invention to them with a view towards promoting and marketing it. Debtor neither produced a final "slick" nor submitted it to potential licensees and manufacturers it had identified. Plaintiff justifiably relied upon this misrepresentation and suffered a monetary loss as a result of his reliance.

The second and third of the above requirements are at issue here. Debtor denies that he knew this representation was false when he made it and denies that he intended to deceive plaintiff when he made it.

A review of the totality of the circumstances compels the conclusion that the second and third required elements are satisfied in this instance. Debtor both knew when he made the above representation that it was false and made it with intent to deceive plaintiff.

The relationship between debtor and plaintiff was built upon a web of deception spun by debtor. Debtor told plaintiff a series of lies at their initial meeting in October of 1999. For instance, debtor told plaintiff that he previously had successfully marketed a product known as a supersoaker; that he had a laboratory and research team in place; and that he had an ongoing relationship with a manufacturer. Debtor knew when he made these assertions that they were all false. They were brazen lies which were intended to deceive plaintiff and to induce him to enter into a promotion agreement and to pay the required promotion fee. Plaintiff had no reason to doubt debtor's veracity and justifiably relied to his detriment upon these representations in entering into the pro-

motion agreement and paying debtor a promotion fee.

The representation by debtor that he would identify prospective licensees and manufacturers and would promote plaintiff's invention to them was just one more lie in the web of deception spun by debtor. He knew that the representation was false when he made it and intended thereby to deceive plaintiff.

Other circumstances bolster the conclusion that debtor knew the representation was false when he made it and that he intended to deceive plaintiff. Debtor was interested only in collecting a promotion fee from plaintiff and never intended to do as he represented he would to promote plaintiff's invention. The little that plaintiff did was meant to lull plaintiff into falsely believing that plaintiff was earnestly attempting to promote his invention.

For instance, debtor and his staff were not competent to perform. They were utterly incapable of promoting plaintiff's invention as promised.

Debtor himself had no skill or expertise to perform as promised. He had been a salesman for more then twenty-five years and knew nothing about identifying potential licensees and manufacturers and had no demonstrable skill in promoting products to them. To the extent that he was involved at all, debtor worked with his sales representative to persuade plaintiff to pay a fee to debtor to market his invention. Debtor was not able to say with specificity at trial what he personally did to market plaintiff's invention.

Of the four individuals employed by debtor, one was a reporter for a local newspaper who wrote press releases, one was a graphic artist who prepared the "slick" for a product, and one was a salesman whose sole function was to persuade individuals to pay money to debtor to promote and market their product. None of these individuals was involved in identify-

ing potential licensees and manufacturers and submitting information about a client's product to them.

The fourth individual, whose role involved identifying potential licensees and manufacturers and introducing a client's product to them, was a college student who worked only ten to fifteen hours a week as a part-time employee for which she was paid $12 per hour. Hers was arguably the most important task in the promotion process. There is nothing in the record to indicate that this individual had any competence whatsoever in performing this critical task.

Evidence that debtor knew or should have known that he and his staff lacked competence to market a product as promised can be found in his track record. Debtor had entered into forty-seven promotion agreements during the years 1998 through 2000 and was not successful in marketing even a single product.

The fact that debtor persisted in entering into promotion contracts in light of his dismal record in our estimation supports the conclusion that debtor never expected or intended to perform as promised. All that mattered to debtor was collecting a promotion fee. Once he did, all bona fide efforts to promote a product ceased.

Further evidence that debtor never intended to promote plaintiff's invention as promised is found in his inaction in promoting the invention for a significant period after the promotion fee was paid. Nothing at all was done to promote it for the first four months. Only after plaintiff persisted in making weekly inquiries did debtor do anything at all. He issued a brief press release in May of 2000, which probably took all of ten minutes to prepare, and put together a preliminary "slick" of the invention, which was merely a mirror image of the drawing accompanying plaintiff's patent application. We have no doubt debtor did these things to convince plaintiff that debtor was making a bona fide effort to promote his invention when in reality he was not. Aside from stating at trial that such things "take time", plaintiff offered no explanation for his failure to do more to promote plaintiff's invention. We fail to comprehend why debtor did so little in this regard unless debtor never intended to perform as promised.

We conclude in light of the foregoing that debtor defrauded plaintiff when he took plaintiff's money and then did virtually nothing to promote his invention before ceasing operations. Debtor knew when he agreed to promote the invention that he would not perform as promised. His objective was to entice clients to pay him a promotion fee while not performing. DBA, in other words, was a scam devised by debtor to prey on unwary individuals who voluntarily parted with their money and received nothing in return.