**NOT FOR PUBLICATION**

# UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re:<br><br>LETICIA JOY ARCINIEGA,<br><br>            Debtor.<br>_____ | BAP No.   CC-15-1123-KiGD<br><br>Bk. No.   6:11-bk-15412-SY<br><br>Adv. No.  6:11-ap-01735-SY |
| LETICIA JOY ARCINIEGA,<br><br>            Appellant,<br><br>v.<br><br>JAMES CLARK,<br><br>            Appellee.<br>_____ | **M E M O R A N D U M**[1] |

Argued and Submitted on January 21, 2016,
at Pasadena, California

Filed - February 3, 2016

Appeal from the United States Bankruptcy Court
for the Central District of California

Honorable Scott Yun, Bankruptcy Judge, Presiding

Appearances:    Bruce Adelstein of Law Office of Bruce Adelstein
                argued for appellant Leticia Joy Arciniega; Chad V.
                Haes of Marshack Hays LLP argued for appellee James
                Clark.

Before: KIRSCHER, GAN[2] and DUNN, Bankruptcy Judges.

---

[1] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, it has no precedential value. See 9th Cir. BAP Rule 8024-1.

[2] Hon. Scott H. Gan, Bankruptcy Judge for the District of Arizona, sitting by designation.

Debtor Leticia Joy Arciniega appeals a judgment excepting a $50,000 debt from discharge under § 523(a)(2)(A)[3] and (a)(6) for false representations Arciniega made in connection with a settlement agreement with James Clark. Arciniega also appeals the bankruptcy court's decision to award Clark $281,000 in liquidated damages and to award him $209,806.42 in attorney's fees as part of the nondischargeable judgment. We AFFIRM, in part, REVERSE, in part, and VACATE and REMAND, in part.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. Prepetition events

#### 1. The marriage and properties purchased

Arciniega is a California realtor and owns a real estate agency. She also has extensive professional experience in the banking industry, including recent employment as a compliance consultant for various financial institutions. Clark is a Vietnam veteran and is Arciniega's former husband.

In 1979, the couple purchased a home known as the Arrowhead Property. In 1991, they purchased a second home known as the Verona Property. Both properties were purchased with Clark's VA home loan entitlement. The couple took title to the properties in both their names. In 1991, Arciniega and Clark separated. Since that time, Clark has lived at the Arrowhead Property; Arciniega has lived at the Verona Property. The marriage was formally dissolved in 2000.

Despite their split, Arciniega continued to make the mortgage

---

[3] Unless specified otherwise, all chapter, code and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

payments on both properties. She and Clark later refinanced the VA loans on both properties. In 2006, Clark conveyed his one-half interest in the Verona Property to Arciniega.

### 2. Clark's lawsuit over the Arrowhead Property

In March 2007, Clark sued Arciniega for claims relating to the Arrowhead Property. Clark sought to acquire title to the Arrowhead Property as his sole and separate property. That same month, Arciniega obtained a second mortgage on the Verona Property from CitiMortgage for $100,000 secured by a junior deed of trust against the property. Arciniega did not tell Clark about the second mortgage.

In late April 2009, Clark and Arciniega settled the Arrowhead litigation, as memorialized in a written Settlement Agreement. Clark signed the Settlement Agreement on May 4, 2009; Arciniega signed it on May 11, 2009. Both parties were represented by counsel. Under the Settlement Agreement, the parties agreed that:

A. By May 13, 2009, Clark would pay Arciniega $50,000, provided that by May 13, 2009, Arciniega had quitclaimed to Clark her interest in the Arrowhead Property; and

B. By May 13, 2010, Arciniega would "take all necessary measures to pay off the existing VA loan and remov[e] [Clark's] name from the loan on [the Verona Property]."
The Settlement Agreement expressly provided that Arciniega was prohibited from attempting to assume the VA loan on the Verona Property. The Settlement Agreement provided for liquidated damages of $1,000 per day for each party should they fail to meet their respective deadlines. It also contained a reciprocal attorney's fees clause.

Per section II.A. of the Settlement Agreement, Clark paid Arciniega the $50,000 and Arciniega transferred her one-half interest in the Arrowhead Property to Clark. However, Arciniega never paid off the VA loan on the Verona Property or removed Clark's name from it as she agreed to do under section II.B. of the Settlement Agreement.

### 3. Arciniega's financial troubles and pre-settlement communications regarding the Verona Property loans

After the Arrowhead litigation had been filed and prior to the execution of the Settlement Agreement, Arciniega had extensive written communications with CitiMortgage and credit counseling agencies regarding her dire financial condition and efforts to modify the VA loan on the Verona Property. Arciniega admitted she did not disclose any of these communications to Clark prior to the parties entering into the Settlement Agreement.

Eight months before she executed the Settlement Agreement, Arciniega received a letter from the VA dated September 3, 2008. The letter included the "Release of Liability" package Arciniega had requested and explained to Arciniega the process of how to assume a VA loan. The letter advised that "if the VA grants a release of liability, this will not restore the veteran's Home Loan entitlement. The veteran will not be able to use his entitlement until you (the assumer) pays the loan in full. In addition, if you (the assumer) defaults on the payments and the lender forecloses on the loan, the veteran will lose his entitlement until you (the assumer) repays VA for the loss suffered in the foreclosure."

Five months before she executed the Settlement Agreement,

Arciniega received a letter from Springboard Nonprofit Consumer Credit Management dated December 8, 2008, in response to a prior counseling session she received. The letter noted that Arciniega's net income was insufficient to maintain the first mortgage on the Verona Property, that her expenses exceeded her income by $3,820 per month, and recommended that Arciniega effect a short sale or deed in lieu.

Four months before executing the Settlement Agreement, Arciniega received a letter from CitiMortgage's Loss Mitigation Department dated January 22, 2009, in response to her request for assistance on the VA loan. The letter, addressed to both Clark and Arciniega, stated that the file had been forwarded to a loss mitigation specialist for review and advised that CitiMortgage was "unable to suspend collection or foreclosure activity until such time that a Workable Solution has been approved or completed, depending on the type of solution offered."

Three months before executing the Settlement Agreement, Arciniega received a letter from CitiMortgage's Loss Mitigation Department dated February 12, 2009, in response to her request for a forbearance plan. This letter, also addressed to both Clark and Arciniega, set forth a forbearance plan for the VA loan on the Verona Property. Arciniega signed the contract agreeing to the plan's terms. Although a signature line was provided for Clark, he did not sign.

About one month before she executed the Settlement Agreement, Arciniega received a letter from CitiMortgage's Loss Mitigation Department dated April 13, 2009, in response to Arciniega's "recent inquiry regarding assistance with [her] mortgage." This

-5-

letter, addressed to both Clark and Arciniega, indicated ways for Arciniega to keep her home and alternatives to foreclosure. The letter stated that "[i]n order to open a file for review in loss mitigation, your request must include financial information from all borrowers who signed the original loan . . . ." Arciniega admitted she did not ask Clark for any financial information so CitiMortgage could open a file for review of loss mitigation.

Three weeks before executing the Settlement Agreement, Arciniega received a letter from CitiMortgage dated April 20, 2009. This letter, addressed to both Clark and Arciniega, indicated that CitiMortgage was "concerned because your mortgage account is still delinquent."

On May 2, 2009, just nine days before she signed the Settlement Agreement, Arciniega sent a letter to CitiMortgage seeking to modify the VA loan and the second loan on the Verona Property. Arciniega explained her dire financial condition and that the current forbearance plan was not sufficient relief. She requested that CitiMortgage "re-write" the loans under the terms she offered. Particularly, Arciniega indicated that: (1) she was "delinquent" on her first mortgage based on its forbearance status; (2) she had effectuated a settlement with Clark that required her to "remove his name from the mortgage on this house" and that she "must remove James' name from the loan;" (3) her declining income made it difficult for her to qualify for a new mortgage to accomplish her requirement to remove Clark; (4) the Verona Property would "not appraise for an amount sufficient to allow for a refinance;" (5) she had "exhausted" her savings "completely;" (6) she earned only $2,700 per month but her monthly

-6-

expenses were nearly $4,000; and (7) she risked losing the Verona Property if she did "not forestall [her] probable delinquency, default and eventual foreclosure." CitiMortgage ultimately granted a modification of the VA loan on the Verona Property.

In addition to not telling Clark about these pre-settlement communications with Springboard or CitiMortgage, Arciniega also admitted not disclosing that her live-in boyfriend, David Christian, recorded a deed of trust against the Verona Property on April 28, 2009, just days before Arciniega signed the Settlement Agreement, purporting to secure a $120,000 loan to Arciniega. At that time, Arciniega valued the Verona Property at $89,000. Christian reconveyed his security interest in the Verona Property back to Arciniega on May 19, 2009, one week after she signed the Settlement Agreement.

### 4. Arciniega's post-settlement communications regarding the Verona Property loans

Per the Settlement Agreement, Arciniega had one year, until May 13, 2010, to "take all necessary measures" to pay off the VA loan and remove Clark's name from it.

On March 10, 2010, Arciniega sent a letter to CitiMortgage, seeking to once again modify the VA loan on the Verona Property. This letter was essentially identical to the one she submitted to CitiMortgage on May 2, 2009.

Arciniega's deadline of May 13, 2010, passed. Eight months later, on January 11, 2011, Arciniega sent a letter to CitiMortgage seeking another modification of the VA loan. This letter was essentially identical to the ones she submitted on May 2, 2009, and March 10, 2010.

**B.   Postpetition events**

Arciniega filed a chapter 7 bankruptcy case on February 18, 2011.

**1.   Clark's adversary action against Arciniega**

Clark filed an adversary complaint against Arciniega, seeking to except the debt owed to him under the Settlement Agreement from discharge under § 523(a)(2)(A) and (a)(6).[4]  Clark alleged that Arciniega had deliberately failed to disclose she had no intention of satisfying the VA loan on the Verona Property, with the purpose of inducing Clark to pay her $50,000.  Clark alleged that he justifiably relied on Arciniega's representations that she intended to pay off the VA loan.  Clark alleged that as a result of Arciniega's false representations and/or actual fraud, he had suffered damages of at least $331,000, exclusive of attorney's fees, costs and interest.

Clark and Arciniega later filed a joint pretrial stipulation.  While they agreed to many facts, one source of disagreement was their differing interpretations of Arciniega's obligations under the Settlement Agreement.  Clark believed Arciniega was required to pay off the VA loan and remove his name from it, which she failed to do.  Arciniega believed she was required only to "take all necessary measures" to pay off the VA loan and remove Clark's name from it, which she contended she did. In other words, Arciniega did not believe she had to actually accomplish the task of paying off the VA loan and removing Clark's

---

[4] Clark also sought to deny Arciniega's discharge under § 727(a)(2) and (a)(4).  The bankruptcy court found in favor of Arciniega on those claims.  They are not at issue on appeal.

-8-

name from it, only that she had to make her best efforts to do so. Thus, Arciniega contended she had not breached the Settlement Agreement.

In her direct testimony declaration filed on January 21, 2014, Arciniega stated that she intended to perform under the Settlement Agreement and that she had been trying since 2006 to pay off the VA loan on the Verona Property and remove Clark's name from it. However, at the time the Settlement Agreement was executed, the Verona Property was severely underwater (by at least $80,000) due to market and economic conditions beyond her control; thus, it could not be refinanced under traditional terms.

In his direct testimony declaration, Clark testified that the reason for removing his name from the VA loan on the Verona Property was so that he could regain his VA home loan entitlement. Clark said he relied on Arciniega's representation that she would pay off the VA loan and remove his name from it by May 13, 2010. He also relied on Arciniega's representation that she would pay liquidated damages of $1,000 per day for each day she failed to meet her deadline. Clark testified that Arciniega executed the Settlement Agreement to induce him to pay her $50,000, knowing she would not perform her obligations in exchange for his. Clark testified that as a result of his reliance, he had incurred $206,000 in actual damages (the $50,000 settlement amount plus at least $156,000 in attorney's fees and costs through trial) and $281,000 in liquidated damages (281 days x $1,000 per day beginning on May 14, 2010, until the petition date of February 18, 2011). Clark testified that had he known about Arciniega's pre-settlement communications regarding her dire financial condition

-9-

and the state of the Verona Property loans, he would not have entered into the Settlement Agreement; these communications clearly showed that Arciniega had no ability to pay off or refinance the VA loan and was not going to be able to simply remove his name from it.

Arciniega, now pro se, filed a second direct testimony declaration on February 24, 2015, along with some proposed, untimely trial exhibits. Clark objected to virtually every paragraph of the 2015 declaration and the proposed exhibits on various evidentiary grounds. Notably, pages 1-3 of Arciniega's latest seven-page declaration contained language identical to that of her earlier declaration filed in 2014, to which Clark had not objected. In any event, the bankruptcy court sustained a majority of Clark's evidentiary objections, including many he asserted for pages 1-3. Much of Arciniega's 2015 declaration and all but two of her proposed exhibits were excluded. Arciniega has not appealed any of the bankruptcy court's evidentiary rulings.[5]

## 2. The trial

The one-day trial proceeded on March 17, 2015. Arciniega represented herself; only she and Clark testified. Clark admitted that within one year prior to entering into the Settlement Agreement he had not received any information as to Arciniega's

---

[5] Clark contends Arciniega improperly included in her excerpts of record documents not admitted into evidence. We agree. Because Arciniega has not appealed the bankruptcy court's evidentiary rulings with respect to the following documents, we did not consider them on appeal: (1) Arciniega's stricken testimony from her 2015 declaration; and (2) the documents attached to Arciniega's 2015 declaration the bankruptcy court excluded. As an appellate court, we can only consider evidence included in the record. Kirschner v. Uniden Corp. of Am., 842 F.2d 1074, 1077-78 (9th Cir. 1988).

-10-

financial condition, yet he believed she had the ability to pay off or refinance the VA loan on the Verona Property. After hearing additional testimony and closing argument from the parties, the bankruptcy court took the matter under submission, stating it would announce its oral ruling the next day.

### 3.    The bankruptcy court's ruling

The bankruptcy court issued its oral ruling on March 18, 2015, finding for Clark on his nondischargeability claims under § 523(a)(2)(A) and (a)(6). The court awarded Clark the $50,000 he paid to Arciniega as part of the Settlement Agreement. It further awarded Clark $281,000 in liquidated damages per the Settlement Agreement, $1,000 per day for each day that Arciniega "did not live up to the provisions of that agreement . . . from the day she breached to the day she filed for bankruptcy." Trial Tr. (Mar. 18, 2015) at 14:17-20. Finally, under Cohen v. de la Cruz, 523 U.S. 213 (1998), the court awarded Clark his attorney's fees and costs based on the fee provision in the Settlement Agreement. The court ordered Clark to file a declaration to prove-up his attorney's fees before entering a final judgment.

After Clark filed the fee declaration, the bankruptcy court entered a judgment excepting Clark's debt of $540,806.42 from Arciniega's discharge under § 523(a)(2)(A) and (a)(6) (the "Judgment"). The Judgment consisted of $331,000 in damages and the $209,806.42 in attorney's fees and costs Clark incurred for the adversary proceeding. Arciniega timely appealed the Judgment.

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(a)(2)(I) and (J). We have jurisdiction under 28 U.S.C.

-11-

§ 158.

## III. ISSUES

1.   Did the bankruptcy court err in determining that Arciniega had acted with the requisite fraudulent intent and that Clark justifiably relied on her representations under § 523(a)(2)(A)?

2.   Did the bankruptcy court err in determining that Arciniega willfully and maliciously injured Clark under § 523(a)(6)?

3.   Did the bankruptcy court err in determining that Clark suffered actual damages of the $50,000 settlement payment as a result of Arciniega's fraud or willful and malicious injury?

4.   Did the bankruptcy court abuse its discretion in awarding Clark liquidated damages of $281,000 as part of the nondischargeable debt?

5.   Did the bankruptcy court err in awarding Clark attorney's fees of $209,806.42 as part of the nondischargeable debt?

## IV.   STANDARDS OF REVIEW

We review de novo the bankruptcy court's legal conclusions, and we review for clear error its factual findings as to whether the requisite nondischargeability elements are present. Tallant v. Kaufman (In re Tallant), 218 B.R. 58, 63 (9th Cir. BAP 1998). Findings of fact are clearly erroneous only if they are illogical, implausible or without support in the record. Retz v. Samson (In re Retz), 606 F.3d 1189, 1196 (9th Cir. 2010).

We review the bankruptcy court's decision to apply § 523(a) to an award of attorney's fees de novo. Redwood Theaters, Inc. v. Davison (In re Davison), 289 B.R. 716, 720 (9th Cir. BAP 2003). See Dinan v. Fry (In re Dinan), 448 B.R. 775, 782 (9th Cir. BAP 2011)(we review de novo the bankruptcy court's decision to award

attorney's fees under state law).

We review the bankruptcy court's decision to award liquidated damages under the abuse of discretion standard. Traxler v. Multnomah Cty., 596 F.3d 1007, 1015 (9th Cir. 2010). The court abuses its discretion if it applied the wrong legal standard or its findings were illogical, implausible or without support in the record. TrafficSchool.com, Inc. v. Edriver Inc., 653 F.3d 820, 832 (9th Cir. 2011).

## V. DISCUSSION

**A. The bankruptcy court did not clearly err in determining Arciniega had acted with the requisite fraudulent intent and that Clark justifiably relied on her representations.**

Section 523(a)(2)(A) excepts from discharge any debt for money, property, services or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation or actual fraud. The creditor bears the burden of demonstrating by a preponderance of the evidence each of the following five elements: (1) misrepresentation, fraudulent omission or deceptive conduct by the debtor; (2) knowledge of the falsity or deceptiveness of the representation or omission; (3) an intent to deceive; (4) the creditor's justifiable reliance on the representation or conduct; and (5) damage to the creditor proximately caused by reliance on the debtor's representations or conduct. Ghomeshi v. Sabban (In re Sabban), 600 F.3d 1219, 1222 (9th Cir. 2010); Oney v. Weinberg (In re Weinberg), 410 B.R. 19, 35 (9th Cir. BAP 2009). Exceptions to discharge under § 523 are narrowly construed in favor of the debtor. Su v. Carrillo (In re Su), 259 B.R. 909, 912 (9th Cir. BAP 2001), aff'd, 290 F.3d 1140 (9th Cir. 2002).

-13-

### 1. False representation

Whether the debtor made a false representation is a finding of fact reviewed for clear error. Candland v. Ins. Co. of N. Am. (In re Candland), 90 F.3d 1466, 1469 (9th Cir. 1996). Under the Settlement Agreement, Arciniega agreed to "take all necessary measures to pay off the existing VA loan and remov[e] [Clark's] name from the loan on [the Verona Property]." The bankruptcy court found this was a specific representation that Arciniega **would** pay off the VA loan and remove Clark's name from it within the specified period. The court rejected as not credible Arciniega's contention that she was only required to **try** to pay off the VA loan and remove Clark's name from it, and that as long as she tried, she would satisfy her contractual obligations. The court found the Settlement Agreement to be "written in a very plain and clear language. There is no ambiguity there." Trial Tr. (Mar. 18, 2015) at 6:23-25. It further found Arciniega's contention that she only had to **try** to perform was undermined by her May 2, 2009 letter to CitiMortgage, written just nine days before she signed the Settlement Agreement, wherein she stated, "I must remove James' name from the loan." Thus, opined the court, Arciniega "knew exactly what she had to do" — either pay off the VA loan or remove Clark's name from it by May 13, 2010. Id. at 7:12-18.

Arciniega disputes the bankruptcy court's interpretation of the "unambiguous" phrase that she would "take all necessary measures" to remove Clark from the VA loan on the Verona Property to mean that she was required to succeed at doing so. Arciniega contends the bankruptcy court interpreted "measures" in a way that

-14-

conflated the means with the ends. It understood "take all necessary measures" as including the end of taking Clark off the loan. She maintains the plain meaning of this phrase is that she had to "take all necessary measures" to accomplish the end of paying off the VA loan or removing Clark's name from it, not that she actually had to accomplish these ends. We disagree.

According to Burton's Legal Thesaurus, the similar legal phrase "take the necessary measure" is a verb meaning: "accomplish, achieve, act, attain, be instrumental, bring to fruition, decide, determine, discharge, effectuate, enforce, execute, find a method, find the means, find the way, follow through, fulfill, gain, gain results, get, obtain, perform, produce, realize." (4th ed. 2007). Clearly then, "take all necessary measures" means to accomplish the end. Here, that meant removing Clark's name from the VA loan by whatever means necessary.

Moreover, Arciniega's interpretation defies logic. Merely "trying" to pay off the VA loan or remove Clark's name from it served no purpose to Clark. Such actions would not restore his VA home loan entitlement or eliminate his liability on the VA loan. In addition, Arciniega's performance of "trying" to get Clark's name off the VA loan would be entirely subjective as to when a breach occurred. How much effort by Arciniega would be enough to satisfy her obligation under the contract? One letter to CitiMortgage? Five letters? Ten letters and five phone calls? Alternatively, whether Arciniega was successful at paying off the VA loan or removing Clark's name from it provides a clear basis for determining any potential breach. Obviously, this was the

-15-

intent of the Settlement Agreement.

Accordingly, the bankruptcy court did not clearly err in finding that the language of the Settlement Agreement was clear and unambiguous and that Arciniega had represented she would pay off the VA loan or remove Clark's name from it.

### 2. Knowledge of the falsity and intent to deceive the creditor

Intent to deceive under § 523(a)(2)(A) is a question of fact we review for clear error. In re Candland, 90 F.3d at 1469. The bankruptcy court examined the evidence, including the testimony offered at trial, and found that Arciniega knew her representation that she would pay off the VA loan or remove Clark's name from it was false, because she knew or should have known at the time she entered into the Settlement Agreement that she could not perform. To support its finding, the court pointed to the pre-settlement letters between Arciniega and Springboard or CitiMortgage, all of which evidenced her knowledge of her dire financial condition and that she did not have sufficient income to pay her expenses. Most persuasive was the fact that these various letters were written a few months, weeks or even days before she signed the Settlement Agreement. Thus, Arciniega was "fully cognizant" of her situation and her inability to perform, yet she still entered into the Settlement Agreement and received the benefit of Clark's $50,000 payment. Trial Tr. (Mar. 18, 2015) at 9:15-20

Of particular importance to the bankruptcy court was the May 2, 2009 letter Arciniega wrote to CitiMortgage, just nine days before she signed the Settlement Agreement, where she acknowledged the Verona Property would not appraise for a sufficient amount for

-16-

refinance, that she was delinquent, her earnings were low and that she had exhausted all of her reserves.

The bankruptcy court also determined Arciniega's fraudulent intent on the basis that she never actually tried to perform under the Settlement Agreement. "A complete failure to take steps towards carrying out a promise can support an inference that the promisor never intended to perform." Field v. Baldwin (In re Baldwin), 2012 WL 909293, at *3 (Bankr. D. Haw. Mar. 15, 2012)(citing Mitchell v. Barnette (In re Barnette), 281 B.R. 869, 876 (Bankr. W.D. Pa. 2002)). Her belief that modification or attempts to assume the VA loan evidenced her attempt to perform and thus proved her intent to perform, she just could not perform, was "not persuasive." Trial Tr. (Mar. 18, 2015) at 10:3-8. The court found that Arciniega knew, as evidenced by the May 2, 2009 letter to CitiMortgage, she had to get Clark's name off the VA loan. The court also considered Arciniega's knowledge and sophistication about real estate and the banking industry in making its intent determination.

Arciniega contends the bankruptcy court's finding that she acted with fraudulent intent was erroneous because it was based on two faulty premises: (1) Arciniega knew she could not remove Clark from the VA loan; and (2) Arciniega knew that "take all necessary measures" required her to remove Clark's name from the VA loan. As for Arciniega's second alleged premise, we have already affirmed the bankruptcy court's finding that Arciniega knew she was required under the Settlement Agreement to succeed in removing Clark's name from the VA loan within the specified time period, not that she merely had to try.

-17-

Arciniega's contends the first premise also fails because she did not **know** she could not remove Clark's name from the VA loan with such certainty as to render her promise fraudulent. The bankruptcy court disagreed, finding that based on her dire financial condition at the time and her sophistication level she knew or should have known that she would be unable to perform under the Settlement Agreement. "[A] promise made with a positive intent not to perform or without a present intent to perform satisfies § 523(a)(2)(A)." Rubin v. West (In re Rubin), 875 F.2d 755, 759 (9th Cir. 1989). Additionally, the promise can be found fraudulent "where the promisor knew or should have known of his prospective inability to perform[.]" McCrary v. Barrack (In re Barrack), 217 B.R. 598, 606 (9th Cir. BAP 1998).

Arciniega relies on Anastas v. Am. Sav. Bank (In re Anastas), 94 F.3d 1280 (9th Cir. 1996), for the proposition that in situations where a debtor faces an objectively difficult time performing an obligation, testifies to an honest belief that she could perform and acts accordingly, it is clear error for the bankruptcy court to infer fraudulent intent solely from the objective difficulty of performance.

In Anastas, the debtor obtained cash advances on several credit cards to finance his gambling. He always made the monthly minimum payment to one particular credit card issuer. Eventually, the debtor was unable to make the payment, given all of his other credit card debts. He tried to work out alternate payment arrangements with the subject issuer before he filed his chapter 7 bankruptcy case, but the issuer refused. The issuer then sought to except the credit card debt from discharge under

-18-

§ 523(a)(2)(A). The bankruptcy court found that the debtor committed fraud within the meaning of § 523(a)(2)(A), because he incurred the debt without the intent to repay.

The Ninth Circuit reversed, holding that the bankruptcy court erroneously based its determination on the debtor's **inability** to pay the credit card debt rather than on his **intent** to pay. The Anastas court held that when determining whether a creditor has established the requisite element of intent in the context of credit card fraud, a court's inquiry must focus on a debtor's intent rather than ability to repay. 94 F.3d at 1285. Financial condition, standing alone, is not a substitute for an actual finding that the debtor intended to deceive the creditor when the charges were incurred. Id. at 1286. Specifically, when determining whether to except a credit card debt from discharge under § 523(a)(2)(A), the court's "express focus must be solely on whether the debtor maliciously and in bad faith incurred credit card debt with the intention of petitioning for bankruptcy and avoiding the debt." Id.

Anastas is factually distinguishable from this case because Arciniega was not trying to obtain credit extensions from Clark. She promised to remove Clark's name from the VA loan by the specified time period by either paying it off or implementing some other means. Further, the bankruptcy court did not infer Arciniega's fraudulent intent solely from her financial condition and the objective difficulty of performance; it inferred her fraudulent intent from evidence that she knew of the impossibility of what she had promised. That evidence consisted of her sophisticated knowledge and the pre-settlement letters from

-19-

Springboard and CitiMortgage, particularly, the May 2, 2009 letter, which reflected that Arciniega was woefully insolvent, that she could not pay her mortgages on the Verona Property, that she risked losing the home to foreclosure, that she had exhausted her savings and, most importantly, that she knew the Verona Property was so far underwater no hope existed to refinance it.

Although Arciniega testified that CitiMortgage required her first to modify the VA loan before it would consider refinancing, no other evidence supported her contention. None of the pre- or post-settlement letters made any mention of the possibility of refinancing, which Arciniega admitted at trial. No one from CitiMortgage offered a declaration; no expert witness testified on her behalf. In addition, the bankruptcy court sustained Clark's objection to Arciniega's testimony as hearsay as to whether or not CitiMortgage required first a loan modification before it would consider a refinance. Trial Tr. (Mar. 17, 2015) at 136:1-137:9.

Because direct evidence of intent to deceive is rarely available, it can be inferred from the totality of the circumstances, including reckless disregard for the truth. Gertsch v. Johnson & Johnson, Fin. Corp. (In re Gertsch), 237 B.R. 160, 167-68 (9th Cir. BAP 1999). Based on the totality of the circumstances, the bankruptcy court concluded that due to her dire financial condition and her knowledge of real estate and the banking industry, Arciniega could not have believed she could refinance, pay off the VA loan or remove Clark's name from it within the required time when she entered into the Settlement Agreement. We do not perceive any clear error in the bankruptcy court's finding that Arciniega acted with fraudulent intent. At

-20-

minimum, the evidence supports a finding that she acted with reckless disregard for the truth.

### 3. Justifiable reliance

Arciniega does not challenge the bankruptcy court's finding as to Clark's justifiable reliance. Therefore, we will not further discuss the issue. See Christian Legal Soc'y v. Wu, 626 F.3d 483, 487-88 (9th Cir. 2010)("We review only issues [that] are argued specifically and distinctly in a party's opening brief.").

**B. The bankruptcy court erred in finding that Clark's damages of the $50,000 settlement payment was proximately caused by Arciniega's fraud.**

Although we conclude that the bankruptcy court did not err in finding that Arciniega made a false representation, that she intended to deceive Clark and that Clark justifiably relied on Arciniega's representation, we REVERSE its finding that Clark was damaged in the amount of the $50,000 payment he made to Arciniega as a result of her fraud.

Another element for an exception to discharge under § 523(a)(2)(A) is that Clark must have sustained loss or damages as the proximate result of the misrepresentation having been made. In re Sabban, 600 F.3d at 1223. The bankruptcy court found that as a result of Arciniega's fraud, Clark suffered damages of the $50,000 he paid to her as part of the Settlement Agreement.

Arciniega challenges the bankruptcy court's finding that Clark suffered actual damages of the $50,000 payment by arguing that for Clark to recover on his fraud in the inducement claim, he had to rescind the Settlement Agreement, return the benefits he received and seek restitution. As an initial matter, Arciniega

-21-

never raised this issue before the bankruptcy court, so we are not required to address it. See Samson v. W. Capital Partners, LLC (In re Blixseth), 684 F.3d 865, 872 n.12 (9th Cir. 2012)(appellate court may decline to address argument not raised before bankruptcy court). Nonetheless, we disagree.

Generally speaking, California law allows fraud plaintiffs to retain the benefits of a contract he or she was fraudulently induced to enter into and at the same time sue for damages for the loss suffered as a result of the fraud. Lazar v. Super Ct., 12 Cal. 4th 631, 646 (1996). In other words, fraud victims can recover out-of-pocket damages in addition to benefit-of-the-bargain damages. See also Robinson Helicopter Co., Inc. v. Dana Corp., 34 Cal. 4th 979, 992 (2004)(where fraud damages are ordered in relation to contractual obligations a fraud plaintiff may recover "out-of-pocket" damages in addition to "benefit-of-the-bargain" damages). One exception to this rule is when the subject contract is a contract for the purchase, sale or exchange of property. See CAL. CIV. CODE § 3343(a)(1). Thus, plaintiffs who are fraudulently induced to enter into property transactions may only recover as a measure of their damages out-of-pocket losses. Fragale v. Faulkner, 110 Cal. App. 4th 229, 236 (2003).

Arciniega contends, but fails to show why, CAL. CIV. CODE § 3343 applies here. An exchange of property was only part of the Settlement Agreement; the transaction here was not a sale, purchase or exchange of property as contemplated by the statute. In any event, settlement agreements appear to be beyond the scope of CAL. CIV. CODE § 3343. Ifeorah v. Flegal (In re Ifeorah), 2015 WL 3895502, at *7 (9th Cir. BAP June 24, 2015)(citing

-22-

<u>Northridge Homeowners Ass'n v. State Farm Fire & Cas. Co.</u>, 50 Cal. 4th 913, 926 (2010)(determining proper measure of damages for fraudulent inducement to enter into settlement agreement without any reference or citation to CAL. CIV. CODE § 3343).

Arciniega has not cited any authority for the proposition that rescission is necessary or even relevant where the claim is one for exception to discharge under § 523(a)(2)(A) or (a)(6). Nevertheless, we reject her argument that Clark was required to rescind the Settlement Agreement because it contained a mutual release of all known and unknown claims. Here, the release was not the sole object of the contract for which the consideration was paid. <u>Persson v. Smart Inventions, Inc.</u>, 125 Cal. App. 4th 1141, 1155-56 (2005)(reviewing California cases).

However, the bankruptcy court did clearly err with respect to awarding Clark damages for the $50,000 payment. Section II.A. of the Settlement Agreement provides that Clark would pay Arciniega $50,000 in exchange for Arciniega transferring her interest in the Arrowhead Property to Clark. These two transactions occurred as agreed. In a separate provision of the Settlement Agreement — section II.B. — Arciniega agreed to pay off the VA loan and to remove Clark's name from it. The only damages associated with her breach of that provision is the liquidated damages of $1,000 per day for each day she failed to perform. No tie exists between the $50,000 payment Clark made to Arciniega and Arciniega's obligation to pay off the VA loan and/or to remove Clark's name from it. Therefore, we fail to see how the $50,000 payment was the proximate result of Arciniega's breach of section II.B or her fraud. Thus, it should not have been included in Clark's damages,

-23-

or the court should have applied a different standard for calculating damages associated with determining damages arising from Arciniega's fraud.

**C.    The bankruptcy court abused its discretion in awarding Clark liquidated damages without determining whether or not such damages were enforceable under California law.**

Arciniega contends that Clark could not recover liquidated damages because that provision is an unenforceable penalty, citing to CAL. CIV. CODE § 1671.[6]  Clark argues that Arciniega did not present this argument before the bankruptcy court and therefore we should not consider it.  Arciniega, who appeared pro se at trial, contended in her closing argument that she was not subject to a "penalty or liquidated damages clause."  Trial Tr. (Mar. 17, 2015) at 179:19.  Thus, we believe she sufficiently preserved the issue for appeal.  Even if not, the question before us is purely one of law, which we have the discretion to consider as long as Clark is not prejudiced.  Columbia Steel Casting Co., Inc. v. Portland Gen. Elec. Co., 111 F.3d 1427, 1443 (9th Cir. 1997).  We conclude Clark is not prejudiced because it was his initial burden to establish damages under § 523(a)(2)(A) or (a)(6); he has fully briefed the issue.  Therefore, we exercise our discretion to consider it. The Settlement Agreement contains a liquidated damages clause which provides that the non-breaching party would receive $1,000 per day for each day the breaching party failed to meet his/her

---

[6] CAL. CIV. CODE § 1671(b) provides:

Except as provided in subdivision (c), a provision in a contract liquidating the damages for the breach of the contract is valid unless the party seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances existing at the time the contract was made.

-24-

respective deadlines. Here, 281 days passed between Arciniega's breach and her bankruptcy filing. As such, and with little explanation, the bankruptcy court awarded Clark $281,000 in liquidated damages.

Liquidated damages specified in a contract may be excepted from discharge under § 523(a) if the debt arose from the debtor's fraud or misrepresentation or willful and malicious injury. Wish Acquisition, LLC v. Salvino (In re Salvino), 373 B.R. 578, 588 (Bankr. N.D. Ill. 2007)(applying § 523(a)(2)(A)); Brzys v. Lubanski (In re Lubanski), 186 B.R. 160, 166-67 (Bankr. D. Mass. 1995)(applying § 523(a)(6)); Weitzer v. Lyman (In re Lyman), 113 B.R. 729, 731 (Bankr. M.D. Fla. 1990)(applying § 523(a)(2)(A)). However, liquidated damages based on a mere breach of contract, even an intentional breach, are not excepted from discharge under § 523. Sterling Factors v. Whelan (In re Whelan), 236 B.R. 495, 504-05 (Bankr. N.D. Ga. 1999); In re Lyman, 113 B.R. at 731; Lipps v. Ky. (In re Lipps), 79 B.R. 67, 69 (Bankr. M.D. Fla. 1987). See Snoke v. Riso (In re Riso), 978 F.2d 1151, 1154 (9th Cir. 1992) (damages for breach of contract, even in the case of intentional breach, are fully dischargeable unless accompanied by tortious conduct).

Under Cohen, an obligation to pay liquidated damages could satisfy the threshold condition that such damages constitute a "debt" as described in § 523(a). 523 U.S. at 217-18 ("Once it has been established that specific money or property has been obtained by fraud, . . . 'any debt' arising therefrom is excepted from discharge."). As the Supreme Court noted "[a] 'debt' is defined in the Code as 'liability on a claim,' § 101(12), a 'claim' is

-25-

defined in turn as a 'right to payment,' § 101(5)(A), and a 'right to payment,' . . . 'is nothing more nor less than an enforceable obligation.'" Id. (quoting Pa. Dep't of Pub. Welfare v. Davenport, 495 U.S. 552, 559 (1990)).

Therefore, liquidated damages could be excepted from Arciniega's discharge under § 523(a)(2)(A) due to her fraud if they are an "enforceable obligation" under California law. In California, a liquidated damages provision will generally be considered unreasonable, and therefore unenforceable, under CAL. CIV. CODE § 1671 if it "bears no reasonable relationship to the range of actual damages that the parties could have anticipated would flow from a breach" and the parties must attempt to "estimate a fair average compensation for any loss that may be sustained." Ridgley v. Topa Thrift & Loan Ass'n, 17 Cal. 4th 970, 977 (1998). In the absence of such relationship, a contractual clause purporting to predetermine damages is construed as a penalty. Id. "The characteristic feature of a penalty is its lack of proportional relation to the damages which may actually flow from failure to perform under a contract." Id. Such penalties are ineffective; the wronged party can collect only the actual damages sustained. Id. See also Ebbert v. Mercantile Tr. Co., 213 Cal. 496, 499 (1931)(any provision by which money or property would be forfeited without regard to the actual damage suffered would be an unenforceable penalty).

The bankruptcy court did not evaluate whether the liquidated damages were enforceable under California law. Given the standard set by the California Supreme Court, it seems unlikely that the $1,000/day provision was related to any anticipated actual loss

-26-

Clark would suffer by remaining on the VA loan. Accordingly, upon remand, the bankruptcy court will need to review the subject provision under the given standard and determine the appropriate amount of liquidated damages, if any.

**D. The bankruptcy court erred when it awarded Clark the full amount of his attorney's fees without stating its basis for doing so.**

Arciniega contends that Clark could not recover attorney's fees because the fee provision in the Settlement Agreement expressly references CAL. CIV. CODE § 1717, which limits recovery to a contract action, not one for fraud. Although she did not raise this specific issue before the bankruptcy court, whether Clark was entitled to attorney's fees as part of the nondischargeable debt is purely a question of law, it was his burden to prove, and he has fully briefed the issue. Therefore, we exercise our discretion to consider it. Columbia Steel Casting Co., 111 F.3d at 1443.

The bankruptcy court did not discuss in detail on what basis it awarded Clark his attorney's fees, stating only that the Settlement Agreement provided for fees to the prevailing party. In any event, we believe the bankruptcy court misapplied the law.

Under the "American Rule," prevailing parties in federal court are not ordinarily entitled to attorney's fees unless authorized by contract or statute. Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 257 (1975). The Code does not provide a general right to recover attorney's fees. Heritage Ford v. Baroff (In re Baroff), 105 F.3d 439, 441 (9th Cir. 1997).

In Cohen, the Supreme Court addressed the issue of whether a prevailing creditor can recover attorney's fees in a § 523(a)(2)

-27-

action and held that a debt incurred by fraud can include attorney's fees and costs. Because the creditors in Cohen were entitled to treble damages and attorney's fees and costs under a state statute for the debtor's fraudulent conduct, the entire debt was excepted from discharge, including the fees and costs.

Cohen is not limited to cases involving statutorily-based attorney's fees; it applies equally to cases in which fees are provided for by contract. In re Dinan, 448 B.R. at 786. In nondischargeability actions, the determinative question for awarding attorney's fees is "whether [the] creditor would be entitled to fees in state court for 'establishing those elements of the claim which the bankruptcy court finds support a conclusion of nondischargeability.'" Id. at 785 (quoting Kilborn v. Haun (In re Haun), 396 B.R. 522, 528 (Bankr. D. Idaho 2008)).

No statutory basis exists for the award of attorney's fees in this case; thus, we focus our analysis on the attorney's fees provision in the Settlement Agreement, which is governed by California law and is the only basis on which Clark could be awarded fees. If the scope of the attorney's fees provision is broad enough to encompass a state court action that has the same elements as a § 523(a)(2)(A) claim — common law fraud — then Clark is entitled to fees. Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman), 234 F.3d 1081, 1083 (9th Cir. 2000). The attorney's fee provision at issue provides, in pertinent part:

> In the event of future actions including, but not limited to filing a motion to enforce settlement, litigation or arbitration relating to the enforcement of this Agreement, the prevailing party shall be entitled to his or her reasonable attorney's fees, expenses and costs incurred therein pursuant to California Civil Code section 1717.

-28-

California law permits recovery for attorney's fees under two provisions. CAL. CIV. CODE § 1717[7] allows a party to recover attorney's fees incurred in the litigation of a contract claim. In re Davison, 289 B.R. at 722 (CAL. CIV. CODE § 1717 provides for attorney's fees in an "action on a contract")(citing Santisas v. Goodin, 17 Cal. 4th 599, 615 (1998)). CAL. CIV. CODE § 1021[8] permits recovery of attorney's fees by agreement between the parties and does not limit recovery of fees to actions on the contract. Id. at 724. Attorney's fees for fraud claims may be recovered if the contract so provides.

Although the arguably ambiguous language of the attorney's fees provision — i.e., "future actions including, but not limited to . . . relating to the enforcement of this Agreement" — could be construed as broad enough to include tort claims such as fraud, the provision's explicit reference to CAL. CIV. CODE § 1717 creates the limitation that reasonable attorney's fees can only be awarded to the prevailing party in an "action on the contract." CAL. CIV.

_____

[7] CAL. CIV. CODE § 1717 authorizes attorney's fees "[i]n any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs." CAL. CIV. CODE § 1717(a).

[8] CAL. CIV. CODE § 1021 provides:

Except as attorney's fees are specifically provided for by statute, the measure and mode of compensation of attorneys and counselors at law is left to the agreement, express or implied, of the parties; but parties to actions or proceedings are entitled to their costs, as hereinafter provided.

-29-

CODE § 1717(a); Hosseini v. Key Bank (In re Hosseini), 504 B.R. 558, 567 n.13 (9th Cir. BAP 2014)(citing Santisas, 17 Cal. 4th 599)(CAL. CIV. CODE § 1717 is to be narrowly applied and is available to a party only if the dispute involves litigation of a contract claim). The fee provision, therefore, is clear; attorney's fees are only recoverable under CAL. CIV. CODE § 1717. See Edwards v. Arthur Andersen, LLP, 44 Cal. 4th 937, 953 (2008)(where language of a contract is clear and not absurd, it will be followed).

Accordingly, Clark had to show that the adversary proceeding against Arciniega was an "action on the contract" to recover attorney's fees. A nondischargeability action may be considered an "action on a contract" even when the plaintiff only asserts one claim for fraud. See AT&T Universal Card Servs.[] Corp. v. Pham (In re Pham), 250 B.R. 93, 96 (9th Cir. BAP 2000)(even though plaintiff did not expressly specify breach of contract as a ground for relief, it nonetheless pleaded a contract cause of action because it sought "determination of [a] debt and recovery of attorney's fees" based on its contract with the debtor). If the action involves contract and tort claims, attorney's fees may only be recovered under CAL. CIV. CODE § 1717 for the fees incurred to litigate the contract claims. In re Davison, 289 B.R. at 723 (citing Santisas, 17 Cal. 4th at 615).

In determining whether a proceeding was an action on a contract, courts may look beyond the parties' pleadings. Sea Win, Inc. v. Tran (In re Tran), 301 B.R. 576, 584 (Bankr. S.D. Cal. 2003)(citing Yadidi v. Herzlich (In re Yadidi), 274 B.R. 843, 851-52 (9th Cir. 2002) and Fed. R. Civ. P. 15(b))(action under

§ 523(a)(2)(A) included a claim for breach of contract, even though complaint only asserted nondischargeability claims, because "the trial was conducted primarily as a breach of contract action."); see Savage v. Brill (In re Savage), 2015 WL 2452626, at *5 (9th Cir. BAP May 20, 2015)(title of cause of action is of secondary importance to the nature of the parties' assertions in applying CAL. CIV. CODE § 1717(a)).  In Tran, the debtor had disputed liability under the contract, requiring the plaintiff to put on evidence to establish both dischargeability and breach of contract.  301 B.R. at 584.

Thus, whether Clark was entitled to an award of attorney's fees under CAL. CIV. CODE § 1717 for an "action on a contract" turns on whether the Settlement Agreement played an integral role in the nondischargeability action.  In re Baroff, 105 F.3d at 442 (nondischargeability action "was an action on [the] contract because the document containing the attorney's fee clause . . . played an integral role in the proceedings.").  In Baroff, the Ninth Circuit distinguished Grove v. Fulwiler (In re Fulwiler), 624 F.2d 908 (9th Cir. 1980), where the contract was collateral to the nondischargeability proceedings.  Id.  In Fulwiler, the bankruptcy court "did not adjudicate the validity of the note in determining whether the debt was dischargeable."  Id. (citing Fulwiler, 624 F.2d at 909-10).  "Rather, the court determined that the debtors obtained the loan evidenced by the note through fraud."  Id.  Unlike the note in Fulwiler, the document containing the attorney's fees clause in Baroff — a settlement agreement purporting to release the parties from all other claims, including the disputed debts at issue — played an integral role in the

-31-

nondischargeability action because the bankruptcy court needed to determine the enforceability of the settlement agreement to determine dischargeability. Thus, it was an "action on the contract" within the meaning of CAL. CIV. CODE § 1717. Id.

More recently in Barrientos v. 1801-1825 Morton LLC, 583 F.3d 1197, 1216 (9th Cir. 2009), the Ninth Circuit in interpreting CAL. CIV. CODE § 1717 reaffirmed its holding in Lafarge Conseils Et Etudes, S.A. v. Kaiser Cement & Gypsum Corp., 791 F.2d 1334, 1340 (9th Cir. 1985), that an action is "on a contract" within the meaning of CAL. CIV. CODE § 1717 whenever "the underlying contract between the parties is not collateral to the proceedings but plays an integral part in defining the rights of the parties."

Clark did not plead a breach of contract claim, but rather only a claim for exception to discharge under § 523(a)(2)(A) and (a)(6). Nonetheless, Arciniega put at issue the phrase "take all necessary measures" in the Settlement Agreement to support her defense that she could not have been liable to Clark for fraud (or breach of contract) because she only had to **try** to pay off or refinance the VA loan and remove Clark's from it, and she **did** try. This required Clark to put on evidence to establish both dischargeability and breach of contract, particularly Arciniega's obligations under the Settlement Agreement. It also required the bankruptcy court to interpret the disputed phrase to determine the validity of her defense, which it did:

> And that is exactly what the contract provides. The contract provides that by May 13, 2010, defendant has to take all necessary measures to either pay off the VA loan or remove James Clark, plaintiff's name, from the loan . . . on the Verona property.
>
> So defendant's testimony and argument that it was her

-32-

subjective interpretation or belief that the contract only required her to just take certain actions, including trying to modify the loan or trying to assume the loan, which is expressly prohibited in the settlement agreement, constituted compliance with the settlement agreement is not persuasive.

Trial Tr. (Mar. 18, 2015) at 7:14-24. Thus, the Settlement Agreement played an integral role in Clark's nondischargeability action.

Accordingly, because the adversary proceeding against Arciniega was an "action on a contract" within the meaning of CAL. CIV. CODE § 1717, Clark was entitled to recover reasonable attorney's fees. However, he was entitled to recover only those fees expended on litigating the contract claim. In re Davison, 289 B.R. at 723 (citing Santisas, 17 Cal. 4th at 615). In the prove-up declaration, Clark's counsel provided no distinction in its not-so-detailed invoices for what fees were incurred for litigating the contract claim as opposed to the fraud claim. The invoices merely show month-end totals.

The bankruptcy court does not appear to have apportioned the fee award to only those fees Clark incurred for litigating the contract claim. It may have considered this issue and decided to award the entire amount of fees Clark requested, but that is not clear from its ruling.[9] In fact, we are unable to tell precisely

_____

[9] We are mindful that under California law:

Attorney's fees need not be apportioned when incurred for representation on an issue common to both a cause of action in which fees are proper and one in which they are not allowed. Attorneys fees need not be apportioned between distinct causes of action where plaintiff's various claims involve a common core of facts or are based on related legal theories. Apportionment is not required when the issues in
(continued...)

-33-

on what basis the court awarded the full amount of fees. As a result, we must remand this issue so it can make a proper fee determination.

## VI. CONCLUSION

For the foregoing reasons, we AFFIRM the Judgment as to the bankruptcy court's ruling that Arciniega acted with the requisite intent under § 523(a)(2)(A) and that Clark justifiably relied on her representations. However, we REVERSE the bankruptcy court's ruling that the $50,000 settlement payment was a proximate result of Arciniega's fraud. We further VACATE and REMAND the Judgment respecting the bankruptcy court's award of liquidated damages in the amount of $281,000 and the $209,806.42 in attorney's fees.[10]

[9](...continued)
the fee and nonfee claims are so inextricably intertwined that it would be impractical or impossible to separate the attorney's time into compensable and noncompensable units.

Harmon v. City & Cty. of S.F., 158 Cal. App. 4th 407, 417 (2007) (citations and internal quotation marks omitted).

[10] Because we have determined that the bankruptcy court did not err in ruling that Clark's debt (whatever the court determines it to be) could be excepted from discharge under § 523(a)(2)(A), we need not address its decision excepting this same debt from discharge under § 523(a)(6). See Fresno Motors, LLC v. Mercedes Benz USA, LLC, 771 F.3d 1119, 1125 (9th Cir. 2014)(we can affirm on any ground supported by the record). Even if we did consider Clark's § 523(a)(6) claim, the Judgment suffers the same deficiency of proximate cause as to the $50,000 payment Clark made to Arciniega and her failure to pay off the VA loan and remove his name from it. The same issues respecting the liquidated damages and attorney's fees also would be present.